[No. 27241.   Department Two.   April 24, 1939.]

WILLIAM D. SINCLAIR, Respondent, v. HALE HAVEN et al., Appellants.[1]

[1]Reported in 89 P. (2d) 820.

J. *Speed Smith* and *Henry Elliott, Jr.,* for appellants.

*Henry Clay Agnew* and *Frank E. Hammond,* for respondent.

GERAGHTY, J.—The plaintiff brought this action to recover damages for malpractice of the defendants, physicians and surgeons, who, as partners, conduct a clinic in the city of Seattle.

The complaint alleged that, following the extraction of a tooth in the fall of 1936, the plaintiff suffered pain of such severity that he could obtain relief only by the use of sedatives; that, while not known to the plaintiff at the time, the sole cause of his suffering was an infection resulting from the tooth extraction, the seat of the infection being in the jaw and an open antrum, facts easily ascertainable by an ordinarily careful physician making a proper diagnosis.

Plaintiff came to Seattle from Wrangell, Alaska, where he resided, and consulted the defendant Hale

Haven. He was informed by Dr. Haven that he was suffering from trigeminal neuralgia, a disease wholly incurable without severance of the trigeminal nerve. He consented to the operation, which was performed February 17, 1937.

It is alleged that the defendant was negligent in severing the nerve, in that he failed to keep the plaintiff under observation for a sufficient length of time, and failed to make any tests in advance to determine the real cause of his condition. The severance of the nerve invariably causes paralysis of one side of the face, with the loss, on that side, of all teeth and of the sense of taste, a gradual loss of hearing and eyesight, and the distortion of the face to such an extent as to render the features repulsive; all of which ailments the plaintiff then suffered by reason of such operation. The severance of the trigeminal nerve was unnecessary and resulted wholly from the negligence and carelessness of the defendants in not properly diagnosing his condition.

Defendants, in their answer, denied all the allegations of the complaint, except that, on February 15, 1937, the plaintiff came to the Mason clinic and consulted with the defendant Haven, and arranged to have him diagnose and treat the plaintiff for an affliction from which he was suffering; that the defendant informed the plaintiff that he was suffering from trigeminal neuralgia, and that the only permanent relief for such condition is the resection of the posterior root of the trigeminal nerve; and that the plaintiff entered the clinic on February 15, 1937, and, on February 17th thereafter, the posterior root of the nerve was resected.

The cause was tried to a jury, and a verdict returned in favor of the plaintiff. A challenge to the sufficiency of the evidence was interposed by the defendants, as well as timely motions for judgment notwithstanding

the verdict and for new trial, all of which were denied. The defendants appeal from a judgment entered upon the verdict. The defendant Haven will be referred to as if sole appellant.

The appellant's first contention is that the evidence is insufficient to sustain the judgment.

The respondent, at the trial, based his claim for recovery solely upon a negligent diagnosis, and the court instructed the jury that, if respondent was suffering from trigeminal neuralgia, there could be no recovery. If it be found that, upon this issue, the evidence was conflicting, the court must assume as true that version of it which tends to support the jury's verdict. *Williams v. Wurdemann,* 71 Wash. 390, 128 Pac. 639.

The rule is well settled that, when a physician and surgeon takes a case, he impliedly represents that he possesses, and the law imposes upon him the duty of possessing and exercising, reasonable skill and learning; that is, such skill and learning as is possessed by the ordinary practitioner in the general locality, measured by the state of medical and surgical science at the time the service is rendered. *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235. But he is not to be charged with negligence merely because the result is not what was desired. In spite of all his skill and learning, there are many factors over which he has no control. *Hollis v. Ahlquist,* 142 Wash. 33, 251 Pac. 871.

The respondent, thirty-two years of age at the time of the trial, had lived in Alaska all his life. He testified that, in 1934, he began to have a pain in the right side of his face and jaw. The pain—a steady ache—would last a few days, cease for an interval, and then return. He had a tooth extracted in 1936. Before this extraction, he had never had a sudden pain; was never able to bring pain on by touching any part of his face. After

extraction, the pain grew worse, an ache in the tooth and jaw. The jaw was treated further, and a splinter of bone removed. Immediately before coming to Seattle to consult the appellant, he had spent a month in bed using an electric pad, applied to his cheek for relief.

Respecting his consultations with appellant, the respondent testified:

"My father was with me when I saw Dr. Haven. I told Dr. Haven my case history from the start. He made an examination; I had X-rays taken of all my teeth, both sides, and he found nothing wrong with the teeth or jaw bone. I had blood tests and almost every other test, I believe. He mentioned nothing being wrong as a result of blood tests. He said there was nothing wrong. He said I had trifacial neuralgia and the only way I could be relieved was by having this operation; he explained the operation and its results; . . . The field of the operation was in the temple; I have a piece of bone removed there about an inch by a half inch. The operation did not relieve my pain and I complained to the doctor. He told me that not enough of the nerve was cut and I'd have to have more of it severed. I told him I had a steady ache all the time. The ache was so severe I could hardly stand it and if I touched my face it made it worse."

A second operation was performed by appellant February 26th. The respondent testified that the pain was not gone, and he again complained to appellant. He was told that the pain would be gone in a few days, but it continued, and, on the recommendation of a sanipractic, who took an X-ray of his mouth, he went for treatment to Dr. Frank H. Wanamaker, a physician and surgeon who had formerly practiced dentistry. He remained in Providence hospital for two weeks under Dr. Wanamaker's care, and got much better.

Donald Sinclair, respondent's father, who was present at the consultations, testified:

"The substance of that conversation was that he told him when it happened, the pain, and how long it continued, and told him it got worse after he put the hot pads on. . . . He [the son] thought there was a cancer, something eating, pain all the time. Dr. Haven just looked in his mouth; he said the only cure for it was to cut the nerves. . . . Between the first and second operations I asked Dr. Haven several times if there was no connection with his teeth when the sores was right in there, if there was no infection. I asked him what the surgeon-dentist said. He said he never saw it. I told him it was time he was getting busy and have the dentist see that before operating the second time. He brought up a man who was dressed different from the Clinic dresses. Dr. Haven was present; first of all they examined the X-rays. He said, 'There is nothing wrong with the X-rays— nothing wrong with his teeth; nothing wrong that I can see from the X-rays.' I asked him where the sores came from if there was no infection in the jaw, the sores on the tongue. He said, 'That is just a herpes condition, shingles.' "

The appellant Dr. Haven, called as an adverse witness by the respondent, testified:

"I elicited the history that for some two and a half years past he had had occasional attacks of pain in his face, which I understood from him at the time was momentary and fleeting, sometimes rather sharp and sometimes sort of achy, that they would come and go and sometimes he would be free of them for a month or more. I think he was free of any semblance of pain for a period of two or three months; that then the pain returned, became a little more severe and more frequent, more constantly present, and he had a tooth pulled. They had felt that this tooth was abscessed. He repeatedly called my attention to the place where this tooth had been removed and that there were some sores there that he thought were probably cancerous. He had difficulty in talking because it seemed to make his face worse. Touching his face along the upper gum and along the lower lip and along the skin over

the upper part of the jaw bone would, as he said, increase this pain, causing him to flinch. . . .

"I had X-rays taken of the plaintiff's teeth at the hospital. I think that after seeing him the first morning I told him it was my impression he had trigeminal neuralgia and explained somewhat to him at that time the implications of that sort of diagnosis; that operation was, to my mind, the advisable thing in those types of cases. I don't recall whether these X-rays of his teeth were examined by me before I told him I'd have to operate for trigeminal neuralgia. . . .

"He did not tell me the same things he said here. Had he told me the same as he testified here, I would have to ask him a few more questions about it to make a diagnosis of trigeminal neuralgia. Without asking the additional questions, I would not have wanted to make a diagnosis and operate unless there were trigger zones obvious there. . . . 'Trigger zones' are the areas on the surface of the skin or gums or the side of the tongue which, when being touched lightly, would markedly increase the pain. . . .

"After having seen him three-quarters of an hour or so and making these findings, I told them it looked very much like a case of trigeminal neuralgia; that further studies for the sake of completeness should be made . . . I examined his nose and throat before I operated on him; examined his gum around where the tooth was and the side of his tongue; examined him physically, had one of my assistants take his history, and got essentially the same history as I did as a check of my questioning of him. I made laboratory tests; we tested his blood and urine. A report was made to me of the findings in all these tests before I operated upon him."

Trigeminal neuralgia involves the trifacial or fifth nerve. The appellant testified that he explained to the respondent, as well as to his father, that this nerve had three branches as it came from the skull, one branch going to the eye and forehead, another to the upper jaw, and a third to the lower jaw. In operating for the disease, it is necessary to pierce the temple

by the removal of a small section of the bone, and sever the nerve between the ganglion and the brain. In the operation, it is desirable to save the motor root, which affects the jaw muscles on the side of the face. The appellant stated in his testimony that, in operating, he injured the motor branch; that it is always his purpose to avoid injuring it if possible, although, if it does not appear clearly and easily separable from the sensory fibers, most surgeons pay little attention to it.

Appellant Maurice F. Dwyer, one of the partners in the Mason clinic, testified that he caused X-rays of the respondent's teeth and jaws to be taken by technicians in his department. The pictures, taken February 15, 1937, the day on which respondent first visited the clinic, showed an infected condition in the jaw. He talked to Dr. Haven about the interpretation of these pictures either the afternoon they were taken or the following morning, probably before he operated.

Dr. Frank H. Wanamaker, called by the appellant, testified that he saw the respondent at his office March 15, 1937, after the two operations for trigeminal neuralgia.

"I found granulation tissue (proud flesh) in the socket of the right upper first molar on examination of the right alveolar process. . . . I put him in the hospital; the X-rays showed that one of the openings went up along the upper bicuspid tooth and the other one went up along the upper molar; I opened up this area along the margin of the gums, laid back the flaps, removed these two teeth, cleaned out the bony process where there was infection, brought the flap back and closed it. I passed probes up into that area trying to find an opening into the antrum and gave him water to take and force into that area. I could not find any opening into the antrum. . . .

"The last time I saw him was April 19, 1937. At that time I considered his jaw condition had been cleared up and the infection cured. I could not tell from look-

ing at the Mason clinic X-ray if that was an infection of long duration; I could not say if it would be accounted for by the pulling of the tooth five months before, because most of the infection is around the upper second bicuspid tooth. I scraped some of the jaw bone out. These alveolar processes had soft tissue and that had to be removed before I could bring my flaps over. I found bone tissue that was spongy from infection around that upper bicuspid tooth; I don't know how long it had existed. . . .

"A careful examination as to teeth condition is usually made before a diagnosis of trigeminal neuralgia; a man may examine that but it will not show up; a tooth may look all right, the X-ray may look all right, and yet the tooth may be an infected tooth and give a lot of trouble. In this case the X-rays did not look all right around that tooth; the antrum looked perfectly all right."

Dr. Conrad Jacobson, specializing in surgery, called as a witness by the appellant, testified on cross-examination:

"If a man came to me with a history of having a tooth removed, then having a steady pain in that area, having a lump lanced there and a splinter of bone removed and the jaw bone scraped and told me that touching it anywhere made it worse for the minute, the first thing I would do would be to take an X-ray picture. Before I operated for trigeminal neuralgia I would look at the picture; if the picture showed an infected area I most probably would send him to a dentist before I would operate. If you get plenty of X-rays they will most probably show up the infection. If the bone has been damaged for two and a half years, you certainly would see it."

We think this testimony clearly raised an issue of fact whether the appellant had failed to exercise the degree of care which the law imposed upon him before making the diagnosis of the respondent's condition, and that the court properly denied the motion for

a directed verdict and for judgment notwithstanding the verdict.

The respondent and his father testified in respect to the case history which they gave to the appellant. The appellant testified that the respondent did not tell him the same things he had told at the trial; that if he had done so, appellant would have asked him a few more questions about the case before making a diagnosis of trigeminal neuralgia. X-rays were taken by Dr. Dwyer before the operation. On direct examination, the appellant said that he could not recall whether the X-rays were examined by him before telling respondent that an operation was necessary. Dr. Dwyer testified that the X-ray pictures he had caused to be taken showed an infected condition in the jaw. He said he had talked about the interpretation of the pictures to appellant probably before the operation. The respondent's father testified that, after appellant had examined the X-rays, he said, "There is nothing wrong with the X-rays—nothing wrong with his teeth; nothing wrong that I can see from the X-rays." Dr. Wanamaker, the appellant's witness, testified that a careful examination of the condition of the teeth is usually made before a diagnosis of trigeminal neuralgia, and that the X-rays showed tooth infection. Another of the appellant's witnesses, Dr. Jacobson, testified that, if the pictures showed an infected area, he most probably would send the patient to a dentist before operating.

The second branch of the appellant's argument is devoted to the errors assigned as grounds for a new trial. The first assignment under this head is that the court committed error in permitting Dr. Clyde M. Mattice, a dentist called by the respondent, to testify in respect to the difference between the pain that would be caused by tooth conditions as he saw them in the

X-rays and the pain that would be caused by trigeminal neuralgia.

After the witness had qualified as a practicing dentist, counsel for appellant inquired what was intended to be proved by the witness. Counsel for respondent replied that he was seeking to prove by the witness that the symptoms of trigeminal neuralgia, as distinguished from the symptoms of pain that would be caused by the condition indicated by the X-rays, would be that, in trigeminal neuralgia, the pain would come on in sudden paroxysms, generally by touching focal points in the face; whereas, pain caused by the condition shown by the X-rays would be made worse by touching temporarily, but otherwise would be steady all the time. The following colloquy then occurred between court and counsel:

"THE COURT: Is there any dispute as to that? MR. SMITH: Yes; the dispute is this, Your Honor: He has just gone a step too far in my judgment; that the trouble in the tooth would produce the trigger areas. Now, that is going to be disputed and very strenuously when we get to it. MR. AGNEW: You claim the trouble in the tooth would produce trigger areas? MR. SMITH: No; it would not. MR. AGNEW: I claim it would not. MR. SMITH: You say in the tooth it does not cause trigger areas? MR. AGNEW: No; it does not cause the trigger areas. That is what I am contending. MR. SMITH: Well, I don't think we are in disagreement on it; that the tooth would not cause trigger areas. . . . THE COURT: If there is no dispute about it, can't we stipulate to that as being a fact and proceed to something else? MR. SMITH: I will stipulate to it. MR. AGNEW: The reason I wanted to prove it was that I did not think I had obtained a definite answer from the doctor as to that fact. MR. SMITH: We will stipulate that he did so answer. MR. AGNEW: Possibly, even though the matter is a matter about which there is no dispute and it would be admitted and stipulated, why, the party would still have a right to prove it. THE

COURT: All right. I will let you do so. Bring in the jury. MR. SMITH: I still say this man is not the right man to prove that by. THE COURT: All right. Bring in the jury."

On return of the jury, Dr. Mattice's answer to the question was:

"A trigeminal comes very intermittently. It is a much sharper pain. It is like an electric shock and it will last, maybe, a minute or two, sometimes longer; sometimes it won't occur again for a month; sometimes not for six months; but it hits you like you have been stuck with an electric needle, while this facial neuralgia which is just an inflammation of a nerve trunk caused by an infection, is a steady constant pain and you can't get away from it."

Dr. Mattice's answer was in substantial accord with the testimony given by the appellant and other medical witnesses. It seems that the appellant was willing to stipulate to the testimony, but objected to its being given out of the mouth of a dentist. Possibly there was some imponderable advantage to the respondent in producing before the jury a witness with the title of doctor, even if not a doctor of medicine, to prove a fact conceded by the parties. But this could not be so prejudicial as to warrant the granting of a new trial. The respondent insisted on making his proof in his own way, and it was within the discretion of the court to permit him to do so.

Apart from this, we think Dr. Mattice, as a qualified dentist, was competent to answer the question. Dr. Wanamaker testified that the teeth are also fed by the fifth nerve, and that an infected tooth or jaw may affect the trigeminal nerve and produce pain, although not trifacial neuralgia. It would seem, therefore, that in his practice a dentist should be able to discriminate between dental and trigeminal neuralgia.

The appellant complains of three instructions

given by the court, in that they overemphasize the right of the respondent to recover in the event the jury found that the appellant had incorrectly diagnosed his trouble. It is not contended that the instructions, considered separately, did not correctly state the law.

The court's instructions, as a whole, were confined within reasonable limits. As we read them, we see no evidence of bias in favor of either party. One of the challenged instructions contains the following paragraph:

"And if you find from a preponderance of the evidence that the symptoms and physical conditions existing and known to the defendant Hale Haven were such at the time that a careful and prudent physician and surgeon would have made further investigation or more and different tests before concluding the plaintiff to be then suffering from trigeminal neuralgia and performing an operation therefor, and that he did not make such investigation or tests, then I instruct you the said Hale Haven would be guilty of negligence and your verdict should be for the plaintiff."

It is urged that the quoted paragraph was unwarranted, because the respondent had at no place in the trial offered evidence as to what other investigation was required, or attempted to show that other tests should have been made.

The appellant himself testified that, if respondent had given him the same case history which he testified at the trial to have given, appellant would have made further investigation before diagnosing the case as trigeminal neuralgia. The testimony of Dr. Jacobson was to the effect that, if a patient came to him with a case history of tooth and jaw trouble such as is detailed in our quoted excerpt from the doctor's testimony, the first thing he would do would be to make an X-ray picture; and before operating for trigeminal neuralgia, would look at the picture, and if it showed an infected

area, he would, most probably, send the patient to a dentist before operating. We see no objection to the instruction.

■ The appellant complains of misconduct of counsel for respondent in his address to the jury.

In the course of his address, counsel asked, "Why the rush, when they botched up one operation to perform another in ten days? There was no rush whatever." An objection interposed to this remark was promptly sustained by the court. Again, counsel said,

"Just infer, if you deem it reasonable to infer, how much trouble it would be for the plaintiff to get one member of the medical profession to testify against another!"

The court sustained an objection to this remark also.

Having read the argument of respondent's counsel as it appears in the record, we are not persuaded that, in his zeal, he so far exceeded permissible bounds as to constitute reversible error, especially in view of the readiness of the court to check him as objections were interposed by counsel for the appellant.

The judgment will be affirmed.

BEALS, STEINERT, and SIMPSON, JJ., concur.

MILLARD, J., dissents.