[No. 31182. Department Two. May 31, 1950.]

LAURETTA KELLY, *as Administratrix, Respondent,* v.
O. G. CARROLL *et al., Appellants.*[1]

[1]Reported in 219 P. (2d) 79.

*H. Earl Davis* and *L. Vincent Donahue,* for appellants.

*Tustin, Chandler & Tustin* and *Clyde H. Belknap,* for respondent.

MALLERY, J.—This was an action for malpractice brought by the widow of Morris C. Kelly, deceased, as administratrix, against the defendants, O. G. Carroll, a drugless healer, and his wife, Angela J. Carroll, his assistant.

From a judgment for the plaintiff, defendants appeal.

Kelly, having been ill for several days, went to the appellant on July 9, 1948, on the advice of his wife, the respondent. A pain, in the region of his stomach, had been bothering him, and the muscles of the abdomen were somewhat rigid. There was some nausea. Appellant was of the opinion that Kelly was undergoing a "reaction." After checking with a stethoscope, appellant applied hot and cold packs. An electrical massage was administered by an electrical device known as a "sine wave." A form of laxative, known to drugless healers as a "42," was given. Appellant did not advise Kelly to remain quiet at home, but, on the contrary, required him to come to his office for treatments until he was unable to do so. On July 10th Kelly's temperature was

96.4 and appellant prescribed hot and cold packs, which respondent applied. On July 11th Kelly went to appellant's office where a sine wave treatment was given, and Kelly regurgitated some afterwards. On July 12th the "42" being ineffective, appellant gave Kelly sodium phosphate as a purge. On July 13th more hot and cold packs were given, followed by another sine wave treatment. On July 15th, the pain having increased, appellant applied more cold packs. On July 16th appellant left town and Kelly was left in the care of appellant's wife, Angela. There being no improvement in Kelly's condition, she prescribed four tablespoonsful of castor oil on July 17th, and again on the 18th. Appellant returned to the city on July 19th, and was called to the Kelly home. Kelly, by this time, was too ill to go to appellant's office. Hot and cold packs were given and, also, a sine wave treatment. Later that day, appellant again came and immediately applied the sine wave. Kelly threw up violently following this. Two unsuccessful attempts were made to give an enema, and appellant expressed the opinion that Kelly had a collapsed lower bowel. At this point, respondent begged appellant to call in a medical doctor. Appellant replied, "We don't need an M. D. If you call an M. D. he will kill him." Respondent again requested that a doctor be called in, whereupon appellant became angry and said he would "throw up" the case if a doctor was called in. Appellant further stated that he would "have him out of this in the next twenty-four hours." On July 20th Kelly's temperature was 100.8 and appellant gave him a sine wave treatment. Kelly regurgitated after the treatment. Hot and cold packs were then applied. Appellant left, after prescribing pineapple juice. At about midnight on July 20th, appellant responded to a call and repeated the hot and cold packs, and the sine wave treatment. Kelly regurgitated matter that appellant said was "pieces of the bowel." Appellant then manually massaged Kelly's abdomen. When appellant left the house respondent followed him outside. Appellant told her that she could now "call an M. D.," but that he was leaving; that he would not

stay until an M. D. arrived, despite respondent's entreaties, because he could not "be here when an M. D. comes." Previous to this last visit by appellant, the brother and sister-in-law of Kelly arrived, and the brother conversed with appellant outside the Kelly house. Appellant told the brother that he was "stumped"; that it was the "toughest [case] I have seen."

Dr. Copsey was called to the Kelly home on the morning of July 21st, after appellant had left, and, immediately diagnosing the case as appendicitis, had Kelly removed to the hospital in an ambulance. At that time Kelly was moribund, and his abdomen was extremely rigid and distended. At the hospital he was given oxygen and treatment for shock, since he was near death and no blood pressure was obtainable. An operation was performed that same day, but no attempt was made to explore after the incision was made, for the reason that a large quantity of pus was encountered, and the doctors thought it best to simply try to drain the matter present before further surgery was attempted.

Kelly died July 28th, and an autopsy was performed that same day. From the autopsy it was determined that death resulted from peritonitis, and that the appendix had completely rotted off from the portion of the bowel to which it is normally attached.

At the threshold of the discussion of this case, several basic propositions call for attention. The first one is that the appellant Carroll is not a doctor.

Throughout the trial, the briefs, and the arguments to this court, appellant was invariably referred to by everyone as "doctor." Rules of law in cases applicable to doctors have been cited without challenge. In previous cases the almost constant assumption that drugless healer "practitioners" were doctors, has gone unchallenged. Indeed, the assumption is of such long standing, and has become so deeply entrenched, that one challenging it, at this late date, is expected to support the challenge rather than merely to make it.

Such an assumption may not be justly attributed to the legislature by reason of anything it said in licensing the drugless healers to practice in this state. An examination of all the statutes bearing upon the subject nowhere reveals any reference to drugless healers as "doctors," nor will the language used sustain even a remote inference that they are permitted to practice any phase of medicine or surgery. Limitation in the statutes specifically negatives such an assumption. Rem. Rev. Stat., § 10124 [P.P.C. § 517-27], prohibits the practitioner from designating himself as a doctor.

Rem. Rev. Stat., § 10114 [P.P.C. § 517-5], provides, in part, as follows:

"The following forms of certificates shall be issued by said board under the seal thereof, and signed by the president and secretary:

"First. A certificate authorizing the holder thereof to practice mechanotherapy;

"Second. A certificate authorizing the holder thereof to practice suggestive therapeutics;

"Third. A certificate authorizing the holder thereof to practice food science;

"Fourth. A certificate authorizing the holder thereof to practice physcultopathy;

"Fifth. A certificate for any other separate and coordinate system of drugless practice, . . . Practitioners hereunder shall confine their practice to the subjects and system or systems represented by their certificate or certificates granted by said board. . . ."

Rem. Rev. Stat., § 10123 [P.P.C. § 517-25], provides as follows:

"The term 'drugless therapeutics,' as used in this act consists of hydrotherapy, dietetics, electro-therapy, radiography, sanitation, suggestion, mechanical and manual manipulation for the stimulation of physiological and psychological action to establish a normal condition of mind and body, but shall in no way include the giving, prescribing or recommending of pharmaceutic drugs and poisons for internal use, the purpose of this act being to confine practitioners hereunder to drugless therapeutics."

In plain English language, a drugless healer practitioner is licensed to make use of (1) heat and cold through

the medium of either water or electricity; (2) exercise or movement of the parts of the body; (3) manual or mechanical massage or vibration of parts of the body; (4) electric radiations or currents; (5) diet; and (6) mental suggestion. In short, his practice must be drugless. ·

■ A drug is a substance that is used as a medicine. As was said in *State v. Baker*, 229 N. C. 73, 48 S. E. (2d) 61:

"A 'drug' is any substance used as a medicine or in the composition of medicines for internal or external use, and a 'medicine' is any substance or preparation used in treating disease. [Citing cases and authorities.] Hence, the term 'drugs' embraces patent or proprietary remedies possessing or reputed to possess curative or remedial properties sold and used for medicines. This is true irrespective of whether such remedies contain poisonous ingredients, or whether they may be purchased without any direction from a physician, or whether they can be obtained at retail stores generally. Calling drugs domestic or family remedies does not rob them of their character as medicines. . . . The lexicographers declare that *a laxative is a medicine*. . . . The test is whether it is administered or employed as a medicine." (Italics ours.)

■ One who administers a drug is practicing medicine. That drugless healers are not doctors, and are prohibited from practicing medicine and surgery, is beyond controversy in the light of our repeated decisions upholding their criminal conviction for that offense.

In *State v. Lydon,* 170 Wash. 354, 16 P. (2d) 848, the court said of a drugless healer, charged with the unlawful practice of medicine and surgery, that

". . . the course of treatment consisted largely of keeping the patient upon a liquid diet with frequent hot baths. It was the theory of the appellant that the general condition of the body should be improved as much as possible by aiding the eliminative processes, and at the same time the cancer would be brought to a head, when it could be treated as boils are commonly treated, that is, by lancing."

The court held that the act of lancing was surgery and sustained the conviction.

The gist of the case of *State v. Karsunky,* 197 Wash. 87, 84 P. (2d) 390, in which a drugless healer was convicted of practicing medicine, and of manslaughter, where no surgery was involved, can be seen from the following quotation:

"Appellant is a drugless healer, but he does not have a license *to practice medicine* in this state. He stopped at regular intervals at a hotel in Vancouver and prescribed for persons who called at his room in the hotel. The medicines prescribed by appellant were prepared by some company outside of this state and sold by appellant in the original package to his patients. Appellant was called 'Dr. Karsunky' by those who called on him for treatment and medicine. He used the title of 'doctor,' which had been given to him in various schools of drugless healing he attended, in connection with his literature, labels, diet sheets, and in making appointments with persons desirous of consulting him concerning their ailments.

"On December 11, 1937, William Hahn called on appellant in the latter's office (hotel room) in a hotel in Vancouver and on that date became a patient of appellant, who did not give Hahn a physical examination, but did quiz him. Hahn informed appellant that his reason for seeking advice and treatment from appellant was that he had sugar diabetes and that he desired to discontinue the use of insulin. Appellant informed Hahn that he could cure diabetes; that his medicine would cure it, but that his medicine and insulin would not mix. He advised Hahn to discontinue the use of insulin and stated he would send medicine by mail C. O. D. to Hahn. In lieu of the strict diet prescribed by Dr. Anderson, appellant gave a new 'diet list' to Hahn. The unrestricted diet prescribed by appellant did not regulate the intake of carbohydrates. Appellant testified that his reason for advising his patient not to take insulin was 'because insulin is not human—it is not fit for any dog.' " (Italics ours.)

It may be added that the unidentified drug he prescribed was harmless, as the court said, "their only effect upon Hahn was psychological." The conviction was sustained.

In the case of *State v. Houck,* 32 Wn. (2d) 681, 203 P. (2d) 693, in which the defendant was charged with the unlawful practice of medicine and surgery in treating an obstetrics case, this court said:

"The title to chapter 36, and § 13 of the act (Rem. Rev. Stat., § 10123), when liberally construed in connection with

the other statutes relating to the care of the sick and afflicted, proves conclusively that the legislature intended to treat drugless healing as it did the other schools of practice—that is, *that drugless healers should be allowed to do only those acts included within the definition which we have heretofore quoted.*

".  .  . It will be noted that the act does not require proof of practical experience in a hospital, nor does it indicate in any way that it was intended to extend the privilege of taking care of women *prior to, at, and after childbirth.* The act makes no reference to the character of school, as do the acts relating to physicians and surgeons, and osteopathy.

"What we have said about *the right to practice obstetrics,* applies with equal force to the administration of ether and the administration of a drug by hypodermic injection. The giving of a drug, either orally or by injection, which, as we have pointed out, is a medicine, is limited to those practitioners especially designated by statute. In this connection, it will be noted that physicians and surgeons are authorized 'to use drugs' and 'to sever or penetrate the tissues of human beings.' " (Italics ours.)

The second proposition is that drugless healers cannot qualify as expert witnesses as to matters in the general realm of medicine and surgery. The first proposition was treated at length, because the second is a corollary to it. We state specifically that we are not here concerned with the testimony of a drugless healer as an expert in the field of drugless healing as permitted by law. But it is apparent that the fields of drugless healing and medicine and surgery are not coextensive, and we are here concerned with that field in medicine and surgery that lies outside of the drugless healing field. Thus, in *State v. Karsunky, supra,* the field of expert testimony was not limited to drugless healers, but was, in the main, covered by medical doctors. We quote:

"Five men of experience in the medical profession testified that the only known and accepted treatment of diabetes mellitus is by the use of a restricted carbohydrate diet and the use of insulin, depending, of course, upon the severity of the disease; and that to induce Hahn to abstain from the use of insulin in view of 'a case of his standing' would be the same as 'signing his death warrant,' as he absolutely could not live without taking insulin. There is no evidence,

other than appellant's testimony, contradicting the testimony of the five experienced physicians."

Of course, a court, in its sound discretion, must pass upon what field of expert testimony is involved in any particular situation, in order to require a proper qualification of an expert witness.

■ There are fields of opinion testimony in which the expert must be licensed, and there are others where he need not be. In the nonlicensed field, the court exercises a sound discretion as to the competency of each individual witness as an expert. In the licensed field, the law presumes that licensed witnesses are experts and nonlicensed witnesses are not. Thus, doctors with unlimited licenses are competent to give expert testimony in the entire medical field. See *Robinson v. Marino,* 3 Wash. 434, 28 Pac. 752, in which the court said:

"Physicians and surgeons of experience are presumed to be acquainted with all matters pertaining to their profession, and to be competent to testify concerning the same."

Chiropractors, on the other hand, are limited in their testimony to their special field. See *Voight v. Industrial Commission,* 297 Ill. 109, 130 N. E. 470; *Carnine v. Tibbets,* 158 Ore. 21, 74 P. (2d) 974.

■ The third proposition is that drugless healers do not belong to a school of medicine. This is also a corollary to the first proposition. As was pointed out in *State v. Houck, supra,* they do not study in medical colleges as defined by statute, but in drugless healing schools. Thus, the particular school of their attendance is not a medical school, nor can such a school be said to adhere to a school of medicine, in the sense that a particular school is identified with a recognized and distinct approach to medical practice or opinion. This is so, notwithstanding the fact that some subjects taught in medical schools are also taught in the drugless healing schools.

In *State v. Houck, supra,* and *State v. Lydon, supra,* it was urged that the purpose of requiring drugless healers to study obstetrics was to qualify them to practice obstetrics.

The *Houck* case settled that contention by definitely holding drugless healers could not practice obstetrics. Treatment of the sick by unskilled persons may be injurious. A knowledge of what not to do may, in some instances, be indispensable to the patient's safety. As was said in *Janssen v. Mulder,* 232 Mich. 183, 205 N. W. 159:

"The defendant maintained an office to which people were invited to come for the relief of human ailments. He admits that there were certain of such ailments which he did not profess to treat. It would seem to follow that he represented and held himself out to the public as possessing the necessary knowledge and skill to determine whether the ailment of the person brought to him was such an one as his treatment would probably relieve. . . . To so determine, it was incumbent on him to use reasonable care and skill to ascertain whether the ailments were of the class to which his treatment applied."

The legislature required drugless healers to pursue certain studies in order that they would know enough *not* to injure patients, and to recognize cases where their limited methods are inefficacious and the services of a doctor are required.

The fourth and last proposition is that one who does not have a license to practice medicine and surgery is, nevertheless, liable for malpractice when he assumes to act as a doctor, and is to be judged as if he were a doctor because of those acts.

The appellant's theory that a drugless healer is licensed to treat all human maladies, and must be exonerated from all liability on his part, if he resorts only to the particular methods of his cult for determining the nature of diseases and the remedies therefor, no matter how serious the consequences, cannot be entertained. That proposition, if accepted as true, would contravene a sound public policy. 21 R. C. L. 383. It would render the legislature's exercise of the police power meaningless and ineffectual in requiring licenses for the treatment of human maladies. The essence of its purpose is to eliminate incompetent persons from holding themselves out to treat the public. A rule of *caveat patiens* would defeat such a purpose.

■ Due regard must be had for the advanced state of medical knowledge at the time of the treatment of any human malady, and refuge may not be found in the practices of the medical dark ages. *Peterson v. Hunt*, 197 Wash. 255, 84 P. (2d) 999; *Sinclair v. Haven*, 198 Wash. 651, 89 P. (2d) 820. It follows that, if there is a reasonable general agreement as to what is the proper medical treatment for a disease or an organic disorder, the question of whether or not the treatment, in a particular case, was correct must be determined by the testimony of expert witnesses from the medical field who alone are qualified to speak.

■ While it is true that a practitioner such as the appellant, is not, in his limited field, required to be an insurer of results any more than a doctor of medicine, still, if he steps out of his limits and undertakes to treat a disorder for which, in the highest level of medical science, there is a generally recognized treatment, such interloper must be held accountable to the accepted standard of treatment. *Nelson v. Harrington*, 72 Wis. 591, 40 N. W. 228; *Walkenhorst v. Kesler*, 92 Utah 312, 67 P. (2d) 654.

Appellant's first assignment of error is directed to a hypothetical question, which the court permitted to be answered. It is as follows:

". . . If a patient presents symptoms of pain in the stomach and throughout the abdomen, nausea and rigidity of muscles in the abdomen, with temperature, and is treated for a reaction for a period of twelve days, and his condition grows much worse, should a sanipractic doctor of average skill and experience as those of the same school of practice in Spokane, Washington, and with the use of ordinary care, be led to suspect that the patient is suffering from appendicitis?"

Appellant's objection that the question contained facts not in evidence is without merit. The question is, in fact, too favorable to appellant, since it offers refuge in his cult without regard to a more reliable science.

Appellant's assignments of error Nos. 2, 3, and 7 are directed to the sufficiency of the evidence.

It was incumbent upon the respondent to show that there had been a wrong diagnosis, and that it had been followed by treatment that was injurious. It was amply clear that Kelly had many of the characteristic symptoms of appendicitis, and appellant must have been aware that appendicitis was a probability, if not a certainty. If it was appendicitis, he had no right to treat it; and if there was a possibility that it was appendicitis, he had no right to gamble with Kelly's life, on the theory that it might be something else.

The gist of appellant's argument is that a wrong rule of law was followed with regard to the admission of evidence and the effect allowed to be given to the evidence. He relied heavily upon *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148, it being his position that the law is that a doctor does not incur liability for his mistakes, if he has used methods recognized and approved by those reasonably schooled in the profession, and that the testimony of other doctors that they would have followed a different course of treatment than that followed by appellant, or a showing of a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. Pursuant to his theory, the appellant produced witnesses, who were drugless healers, who supported his version of the facts as to the diagnosis and treatment of the deceased. It is appellant's position that a doctor of a particular school may practice according to the tenets of that school, and that the testimony of a doctor of a different school, who disagrees with the treatment, cannot establish negligence. In short, that a drugless healer must be tried upon the expert opinion of drugless healers only, and that they will not be liable if they follow the tenets of their school.

We may grant at once that there has been such a rule applied between doctors. We repeat that appellant is *not* a doctor, and it might be thought to be presumptuous on his part to attempt to invoke a rule applicable only to doctors. He is a practitioner under the statute providing for drugless healing. He did not attend a medical school

for doctors as prescribed by statute. Rem. Supp. 1947, § 10008. He may not practice medicine. Drugless healers, with licenses of the kind possessed by appellant, have been repeatedly convicted in this state for the practice of medicine.

The court should not apply such a rule to drugless healers, because it is obvious that their qualifications are so far inferior to those of a doctor that the law will conclusively presume that they are not upon terms of equality which would entitle their opinions to cancel out the best medical opinion available. Should any court so hold, it would bring reproach upon judicial processes by departing from the time-honored rules of evidence devoted to the most trustworthy ways of revealing truth, which has always admitted the best evidence available.

With the advance of medical science, it is apparent that there is less and less occasion to invoke the rule, even between doctors. The history of this rule is found best stated in an old Washington case, *Ennis v. Banks,* 95 Wash. 513, 164 Pac. 58. In that case an allopathic physician had given a patient, suffering with typhoid fever, milk toast and a poached egg. The patient died. In an action for malpractice, the plaintiff purported to prove that this had caused the patient's death by the testimony of a homeopathic physician. At that time, the best qualified doctors were frequently divided into the allopathic and homeopathic schools of thought, and since they were equally high and equally expert, and since their views could not be reconciled, the court naturally enough felt incompetent to choose between them, and so the rule was promulgated. The court said:

"Each school of medicine is entitled to practice in its own way, and because one does not use the methods of the other is no reason for holding the one for malpractice. In the case of *Dahl v. Wagner,* 87 Wash. 492, 151 Pac. 1079, we said:

" 'It has been the uniform holding of this court that *where doctors of equal skill and learning,* being in no way impeached or discredited, disagree in opinion upon a given state of facts, that the courts cannot hold a defendant in a

malpractice suit to the theory of the one to the exclusion of the other.' " (Italics ours.)

Historically speaking, the war that raged between the homeopaths and allopaths was in the dark age of medicine. Indeed, many modern doctors are not acquainted with the names, and the distinction between the schools has completely disappeared in the light of scientific strides made in recent years. Moreover, it should be remembered, in connection with the promulgation of the rule, that both witnesses were doctors of the highest standing and knowledge, and that they were equal in that there was no higher source of medical knowledge available. In any event, the rule can avail the appellant nothing, because its rationale is applicable only where doctors are concerned who are equal in their qualifications, and where no recourse can be had to higher learning or greater experts.

Appellant's assignments of error Nos. 4, 5, and 6 are directed to instructions given or refused by the court.

Assignment No. 4 is directed to the refusal of the court to give appellant's requested instruction No. 2, which reads as follows:

"You are instructed that to sustain a judgment against a physician the standard of healing practice in the vicinity must be shown and, further, that the doctor failed to follow the methods prescribed by that standard. However, it is not required that the physician guarantee results, nor that the result be what is desired.

"You are further instructed that testimony of other physicians in the same school of practice that they would have followed a different course of treatment than that followed by the defendant, or *a disagreement of doctors of equal skill and learning in the same field of practice* as to what the treatment should have been, does not in itself establish negligence." (Italics ours.)

This instruction ought never to be given under any circumstances where a defendant is a drugless healer, although it is a sound instruction as to a doctor, for the reason heretofore given. It was not error to refuse it.

Assignment of error No. 5 is directed to the refusal of the

court to give appellant's requested instruction No. 8, which is as follows:

"You are instructed that if you find from the evidence in this case that the defendant diagnosed the ailment from which the said Morris C. Kelly was suffering as an ulcerous, abscessed or tubercular condition of the intestines, and then followed that diagnosis by treatment such as is taught or followed by the school of drugless healing of which he is a member and under which he or she is practicing and authorized to practice, then he would not be held chargeable with negligence, and your verdict should be for the defendant.

"In this connection you are further instructed that if you find from a preponderance of the evidence in this case that the deceased, Morris C. Kelly, or the plaintiff herein knew at the time they employed the defendant that he belonged to a branch of the drugless school of healing which does not follow surgery, then the plaintiff in this case cannot charge the defendant with negligence in failing to advise or perform a surgical operation as treatment for the ailment from which the said Morris C. Kelly was suffering."

The first paragraph of this instruction does not state the law, for the reasons heretofore given. The appellant argues that,

"Without the last paragraph of requested instruction No. 8, the jury might well have decided that it was the duty of the defendant practicing as a drugless physician to abandon his own method of drugless treatment in an appendicitis case and run to a surgeon for help. . . ."

His contention is without merit. Such a finding by the jury would be justified as to the facts and correct as to the law.

A drugless healer is in a position of trust and confidence as regards his patient, and if he knows or should know that any treatment he is permitted to use will be of no benefit to the patient, it is his duty to so advise. If there is another mode of treatment that is more likely to be successful, which treatment he does not have the right to give, it is his duty to send the patient to a doctor. The relation between a physician and his patient is predicated upon the proposition that the physician has

special knowledge and skill in diagnosing and treating diseases and disorders. See *Tvedt v. Haugen,* 70 N. D. 338, 294 N. W. 183, 132 A. L. R. 379. In that case a medical doctor was held liable in a malpractice action for continuing an ineffective course of treatment, reassuring the patient, meanwhile, when he knew or should have known that the services of a specialist were indicated.

We hold that, by analogy, the same duty is imposed upon all branches of healing. In the case at bar, the appellant knew or should have known that the treatment called for was beyond the scope of his license and ability. If a practitioner, such as the appellant, declines to discharge his duty to call in a qualified doctor when the situation obviously calls for it, he proceeds at his peril.

The time spent on futile measures, harmless generally in and of themselves, in treating a disease, the natural course of which, if unchecked, may produce death, will, in many cases, so delay the use of proper treatment as to render it ineffective in the end. In short, time is sometimes of the essence in the field of medicine, and it is not a matter of indifference that the sands are allowed to run out of the hourglass, while a drugless healer withholds his patient from proper medical aid by such threats as "if you call an M. D. he will kill him."

As soon as appellant ascertained or should have known that the deceased had appendicitis, he should have sent him to a doctor or a surgeon. *Tvedt v. Haugen, supra.*

The second paragraph of appellant's requested instruction No. 8, as heretofore quoted, should logically be considered in connection with appellant's assignment of error No. 6, which is directed to the court's refusal to give appellant's requested instruction No. 10, which reads as follows:

"You are instructed that if you find from the evidence that the plaintiff Lauretta Kelly and her husband knew that under the tenets and practice of the school or branch of drugless healing followed by the defendant, O. G. Carroll, treatment was given to induce or produce a crisis or reaction, and that when a patient was in a crisis or reaction, no change of treatment or surgical operation should be made or per-

formed because of the effect of interfering with the progress of such crisis or reaction, and you further find that with such knowledge the plaintiff or the said Morris C. Kelly, at a time when the said Morris C. Kelly was in a crisis or reaction, caused or permitted the said Morris C. Kelly to submit to a change of treatment and a surgical operation, and the said Morris C. Kelly died, the plaintiff and the said Morris C. Kelly would be guilty of contributory negligence contributing to the death of the said Morris C. Kelly, and your verdict must be for the defendants."

It was not error to refuse these instructions.

■ Appellant makes much of the contention that Kelly had assumed the risk and was guilty of contributory negligence, in that he knew the appellant would not operate, nor would he advise an operation. Appellant bases his contention on his own former case of *Wilcox v. Carroll,* 127 Wash. 1, 219 Pac. 34, which is similar on its facts to the case at bar. Appellant cites that case for the proposition that one who submits to a drugless healer assumes the risk, and is estopped from a recovery in the event the patient dies, so long as the drugless healer, in good faith, treats the patient according to his own method. We quote the gist of that case:

"The eight-year-old son of respondent was taken ill on Wednesday, December 28, 1921, complaining of stomach ache. He was confined to his bed on the next day and on the 30th. On that day, he displayed such symptoms of appendicitis as to make the mother fearful that he was suffering from that disease, and that he should be put in the care of a physician. Accordingly, on the 30th, having faith in appellant as a drugless physician, she telephoned him, described the symptoms to him, and expressed the fear that the child had appendicitis. Appellant told her that the child could not possibly have appendicitis because the appendix did not form until a child was at least ten years of age. On that day she took the child to appellant's office, again explained the symptoms to him, with the statement that, if the child had appendicitis, she wanted an operation if appellant thought one necessary. She was again assured by appellant that the disease could not be appendicitis. She was also told by appellant that the child was suffering from either spinal meningitis or from infantile paralysis; and that, if a regular physician had been called on the case he would

inject a serum into the spine of the child which would make him a cripple for life. He asked respondent if she desired him to give the child treatment, and because, as she said, she thought appellant could do as well as anyone if the child did not have appendicitis, she employed him to treat the child.

"The next day, Saturday, appellant gave the child another treatment at his office, but did not express an opinion as to what disease the child was suffering from. On Sunday he again treated the child at his office, and then diagnosed the child's trouble as being inflammation of the spine and congestion of the bowels, and continued the same treatment he had been giving theretofore. He gave the child daily treatment until Friday, January 6, 1922. The treatments in general consisted of electric massage of the spine, alternate applications of hot and cold compresses to the abdomen and back, sitz baths and internal baths. The child was brought to appellant's office by automobile for each treatment.

"From the first day appellant treated the child—that is, on Friday the 30th, until the following Wednesday—by direction of appellant, respondent gave the child no food. On the following Wednesday, she told appellant that the child asked for food and, she testified, appellant told her to give the child a little beef broth and a little diluted grape juice, which she said she gave according to directions that night and the next day.

"It seems that the child grew worse, or at least grew no better under the treatment; and on Friday, January 6, respondent became so alarmed at the child's condition that she called appellant to her home. He went about 2:30 p. m., and gave the child a treatment there consisting of wrapping him in a wet sheet. After remaining a short time, he left, leaving instructions for the mother to call him at 5:30 p. m. The child's temperature dropped until it had become below normal—in fact about 94 degrees—when respondent became so alarmed that she telephoned appellant before the prescribed time, telling him of the temperature. Appellant then told her that there was something about the condition of the child that he did not understand; for her to take the child out of the wet sheet and call a regular physician, but not to let the physician know that appellant had been treating the child.

"Respondent thereupon called Dr. R. E. Ahlquist, a regular physician and surgeon, who diagnosed the disease as acute appendicitis where the appendix had already bursted and

peritonitis had set in. Dr. Ahlquist found the child in practically a dying condition when he was called in, but believed that the child would have more chances of surviving with an operation than without. He therefore operated on the child that night; and upon the abdomen being opened, at least a pint of pus shot up out of the abdominal cavity and the appendix was found to be ruptured and gangrenous. The child died the next morning."

It is true that the following dicta is to be found in the opinion:

"Of course, it must be admitted that, when respondent employed appellant to doctor her child, she knew that he belonged to what is called the drugless school of healing, which would not operate. She cannot be heard to complain because an operation was not performed or advised by appellant. She cannot employ a doctor whom she knows will not operate and then recover damages because an operation was not performed."

However, the result arrived at in that decision was exactly contrary to the quoted dicta, and cannot be reconciled with it. Being dicta, we do not need to either follow it or overrule it, since it never was the law.

On the question of contributory negligence, in such cases as the one at bar, it is the law that

" . . . it is not a part of the duties of a patient to distrust his physician, or to set his judgment against that of the expert whom he has employed to treat him, or to appeal to other physicians to ascertain if the physician is performing his duty properly. The very relation assumes trust and confidence on the part of the patient in the capacity and skill of the physician; and it would indeed require an unusual state of facts to render a person who is possessed of no medical skill guilty of contributory negligence because he accepts the word of his physician and trusts in the efficacy of the treatment prescribed by him. A patient has the right to rely on the professional skill of his physician, without calling others in to determine whether he really possesses such skill or not. The patient is not bound to call in other physicians, unless he becomes fully aware that the physician has not been, and is not, giving proper treatment. *Schoonover v. Holden* (Iowa) 87 N. W. 737; 48 C. J. p. 1135." *Halverson v. Zimmerman,* 60 N. D. 113, 232 N. W. 754.

Appellant's contention ignores all the licensing statutes which, as an exercise of the police power, have as their purpose the protection of the public against the dangers of incompetence in matters of health. The exercise of this power is incompatible with putting the individual to the hazard of risking incompetence in the selection of persons to treat him. It is the purpose of licensing laws to eliminate all incompetent persons from holding themselves out to treat the public. The assumption of risk doctrine is never applicable in such situations.

Appellant's assignment of error No. 8 is directed to the court's refusal to grant a new trial based upon the affidavits touching the conduct of the jury and that of the respondent. The most that can be said for the showing made, in the affidavits, is that Mrs. Kelly's emotions were thought to have aroused the sympathy of the jury, and that the jury used bad logic in arriving at its verdict. A jury cannot impeach its own verdict by such affidavits. *Maryland Casualty Company v. Seattle Electric Company,* 75 Wash. 430, 134 Pac. 1097. The other affidavits are hearsay and establish no more than that appellant was not pleased with the verdict.

The judgment is affirmed.

SIMPSON, C. J., ROBINSON, HILL, and HAMLEY, JJ., concur.

---

July 19, 1950. Petition for rehearing denied.