Margaret D. HOPKINS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 9661.

United States District Court
W. D. Missouri, W. D.

June 28, 1957.

474

Terry, Jones & Welton, Kansas City, Mo., Byron E. Roche, St. Louis, Mo., for plaintiff.

Edward L. Scheufler, U. S. Atty., Paul R. Shy, Asst. U. S. Atty., Kansas City, Mo., for defendant.

R. JASPER SMITH, District Judge.

This is an action by Margaret D. Hopkins v. United States of America under the provisions of the Tort Claims Act, Title 28 U.S.C.A. § 1346 et seq.

Plaintiff served as a member of the enlisted personnel of the United States Women's Army Corps, and was honorably discharged from service on June 27, 1944. Since early childhood she had a disease known as fibrous dysplasia involving the right frontal area of her head. The disease was progressive and caused a marked thickening of the right frontal bone, pressing on the right optic nerve and the right orbit, causing a partial loss of vision. On January 28, 1954, she was admitted to the Veterans' Administration Hospital in Kansas City, and after extensive investigation and examination, it was concluded that surgery was necessary to relieve the pressure on the optic nerve and retard the failing visual acuity of the right eye. Dr. Charles E. Brackett, Jr., an instructor in neurosurgery at the University of Kansas Medical School, with a history of wide specialized training in surgery involving the brain and head, including craniotomies and craniectomies, and who was consultant in neurosurgery with the Veterans' Administration Hospital, was in charge of the operation. It was concluded that the operation was to be a craniectomy, i. e., a piece-meal removal of the affected bone of the frontal area, to relieve pressure on the optic nerve and to remove pressure on the brain. There were to be at least two operations, the first to remove the diseased bone and to make a mold of the defect in the skull, and the second to install a metal plate which would be made from the mold taken during the first operation. The proposed operative procedure was discussed fully with plaintiff, she agreed to the operation, and was operated March 16, 1954. The anesthetist, a Dr. Max Miller, was successful in "intubating"

the patient on the first attempt. Extensive bone removal was made during this operation but it was not completed, and after approximately four hours it was Dr. Brackett's decision that it would be in the best interests of plaintiff to discontinue the operation and complete the bone removal during a second operation.

During this first operation the dura, covering of the brain, was exposed but not entered, and the supra orbital ridge remained intact. The skin flap was replaced and the plaintiff made a normal recovery from this operation.

Shortly after the operation plaintiff complained of soreness of the right jaw but there was no evidence of fracture or dislocation of the mandible.

The second operation was performed April 20, 1954, and the original plan was to complete removal of bone, take a plastic mold of the defect and insert a plate at a subsequent operation. On this occasion the anesthetist encountered considerable difficulty in the intubation of the patient, with some forty-seven minutes required to pass the intratracheal tube. Dr. Brackett completed the removal of the diseased bone, removing the roof of the right orbit and the superior aspect of the optic foramen. Although the doctor originally planned to close the wound at this point after taking an impression of the defect, and have a custom made plate for insertion at a later date, it was his best judgment that because of the extreme difficulty of intubation, another operation would endanger plaintiff's life and he concluded to use a preformed plate to cover the defect. Several steel plates of various sizes were available in the operating room. He took one of these, which covered the defect except for a gap in the anterior portion, secured it into position with a steel wire, replaced the skin flap, and the patient made a normal post operative recovery. In the opinion of Dr. Brackett, the plate was about one-sixteenth of an inch too low. Plaintiff was released from the hospital July 8, 1954, as the result of the decision of Dr. Brackett

and hospital authorities that maximum hospital benefits had been obtained.

Plaintiff again contacted the Veterans' Administration on July 20, 1954, complaining of the results of the two operations. Consulting physicians concluded that the operation was successful for the purpose for which it was intended.

She again appeared for further examination October 8, 1954, at which time the edges of the steel plate were discernible and there was some movement of the plate upon pressure. Dr. Brackett was of the opinion that fluid had formed behind the plate or that there had been a progression of the disease that caused the mobility, and plaintiff was requested to wait for a medical conference to determine if further treatment was indicated.

Plaintiff left the hospital voluntarily before this conference had ended.

Subsequently on November 7, 1954, plaintiff was admitted to the Veterans' Administration Hospital at Wadsworth, Kansas. Plaintiff complained of the facilities of the hospital and on November 8, 1954, she voluntarily left the hospital.

There is no persuasive evidence to support the claim that the Veterans' Administration abandoned plaintiff as alleged in her complaint.

Two subsequent operations were performed on plaintiff by a Dr. Roland Klemme, of St. Louis, the first to replace the steel plate with a plate of plastic material, and the second to trim and make some adjustments in the plate. Evidence indicates that in operations of this character it is necessary at times to take corrective action for adjustment of plates.

Plaintiff predicates her claim for damages on the premise that defendant failed to exercise reasonable caution in providing for proper plating material to cover any reasonably expected skull defect; that defendant failed to make reasonable provisions for intubating plaintiff when it had actual notice of the existence of fibrous dysplasia in the

plaintiff's right jaw; that the defendant was negligent in that the operating surgeon placed the metal plate below the right supra orbital ridge causing pressure and inability to close the right eye and thereafter refused to correct it; and finally that the two operations performed on March 16, 1954, and April 20, 1954, were not performed according to accepted medical practices in the general area and that they were not successful for the purposes for which they were intended.

As to the first two elements, i. e., the failure to provide adequate materials to cover any reasonably expected skull defect or to make reasonable provision for difficulty in intubating the plaintiff in the face of actual notice of fibrous dysplasia in plaintiff's right jaw, there simply is a failure of proof, and these elements are ruled against plaintiff. The third and fourth elements, i. e., the insertion of the metal plate below the right supra orbital ridge, and the charge that the operations were not performed according to the accepted medical practices in the area, we can only predicate our decision on the fact that charges of that character do not prove themselves. Negligence cannot be inferred simply from the fact that plaintiff is dissatisfied with the results of the operations or from the fact that the metal plate may have required subsequent adjustment.

A plaintiff in a malpractice action assumes a very heavy burden where the basis of recovery is predicated on an attack on the technique and skill exercised by an operating surgeon or on a charge that he failed to exercise reasonable judgment. In the absence of most unusual circumstances it is a burden that cannot be discharged in normal course by lay testimony. Plaintiff recognized the severity of this burden and attempted to supply this fatal omission by testimony of Dr. George Hawkins, a neurosurgeon in St. Louis, Missouri. The sum of Dr. Hawkins' testimony was that the choice of types of plates and types of metal was within the discretion of the operating surgeon and that all types

were acceptable; that corrective action to adjust the placement and location of plates was not unusual, and by inference at least, that necessity for correction and readjustment of plates was no indication of negligence, or otherwise improper installation. In short, the testimony of Dr. Hawkins was completely negative as to any evidence of negligence or improper conduct on the part of defendant or its surgeons.

Plaintiff has cited several cases purporting to be authority for the claim that expert testimony is not required; but none of them are persuasive in a situation of this character. Several of them are cases where the issues were determined on motion to dismiss prior to submission to a jury; and in those cases, following the well known rule of granting all reasonable inferences most favorable to the plaintiff, the courts concluded that the motions to dismiss should not be sustained. That is not true here. "In an action for malpractice a physician or surgeon is entitled to have the treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, * * * and if he performs the treatment with ordinary skill and care in accordance with his system, he is not answerable for bad results." See Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S.W.2d 606, 608.

While I am not persuaded that the operations were unsuccessful for the purposes for which they were intended, even an unsuccessful result is not evidence of negligence. See Bailey v. St. Louis-San Francisco Railway Co., Mo. App., 296 S.W. 477, and cases cited.

I find no competent evidence in the record that Dr. Brackett failed to use his best judgment throughout both operations or that there was neglect of plaintiff to any degree during the post operative period. There is no persuasive evidence whatever, by expert testimony or otherwise, from which a trier of the facts reasonably can find that Dr. Brackett's activities in this case or his judgment in the actions taken by him were

contrary to recognized medical opinion and practice. When plaintiff fails to show by calling an expert that the care given by defendant and its agents falls below the required standard of the school of medicine to which he belongs, and fails to show that Dr. Brackett neglected to use standards of skill and treatment required of others in the area, then plaintiff has failed in her burden. See Rodgers v. Lawson, 83 U.S.App.D.C. 281, 170 F.2d 157; Ayers v. Parry, 3 Cir., 192 F.2d 181.

Since in my opinion plaintiff has failed to sustain the burden cast upon her to prove negligence, it follows that judgment must be entered in favor of the defendant and against the plaintiff.

Plaintiff prior to trial presented her application and affidavit to proceed in forma pauperis. Insofar as it relates to the trial in this Court, the motion is sustained. This is not intended, however, as authorizing an appeal in forma pauperis. If plaintiff desires that action, it must be by separate motion, considered at that time. It is so ordered.