[No. 731-40891-1.    Division One—Panel 1.    March 1, 1971.]

JOHN C. HOGLIN et al., *Appellants,* v. JOANNE ARDEN BROWN, *Individually and as Executrix, Respondent.*

*Douglas A. Wilson,* for appellants.
*John Gavin, Spencer D. Short,* and *Cleary S. Cone,* for respondent.

HOROWITZ, C.J.—Plaintiffs, husband and wife, brought an action against the estate of Dr. Virgil George Brown, who at the time of the events giving rise to the litigation was engaged in the general practice of medicine in Ellensburg, Washington. The court entered judgment on the jury's verdict in favor of the defendants. Following a denial of the plaintiff's motion for judgment notwithstanding the verdict or alternatively for a new trial, plaintiffs appeal.

The death of Dr. Brown deprived the parties of the benefit of his testimony concerning events occurring in the period from March 27 to April 24, 1967. From his notes and other evidence, however, the jury could have found the following as the facts in the case.

Dr. Brown, at and for a long time prior to the time here involved, practiced general medicine in Ellensburg, Washington, as a partner with other doctors, including Dr. James A. Cobb. Dr. Brown practiced obstetrics and in that connection diagnosed pregnancies, performed hysterectomies and other surgical operations.

Plaintiff, Mrs. Carolyn C. Hoglin of Ellensburg, at the time of treatment was about 32 years of age with two daughters ages 13 and 9, the daughters having been delivered after normal term pregnancies. She had a history of pelvic difficulties. Her last menstrual period was on February 14, 1967. On March 27, she consulted Dr. Brown at his office for advice and treatment for her pelvic pain and difficulties. Dr. Brown then obtained the patient's history and performed a pelvic examination involving bi-manual palpation of the uterus. His resulting diagnosis was that of a "retroverted, moderately enlarged fibroid type of uterus and of probable cervical stenosis." A retroverted uterus is one which turns backward into the pelvic region instead of being up in the pubic region where it belongs. A fibroid

type of uterus and cervical stenosis is a condition where scar tissue, called fibroids, appears on the wall of the uterus and is accompanied by a narrowing of the opening to the cervix, which results in a difficult exit of the menstrual flow.

It was necessary for Dr. Brown to rule out the possibility that Mrs. Hoglin was pregnant. There are various tests available for that purpose. One is a test known as Gestest, which involves taking hormone tablets for 2 days; pregnancy is indicated if menstruation is not induced within 5 days, or at most within 2 weeks thereafter. However, the Gestest is regarded as the least reliable of the several tests. Dr. Brown prescribed the Gestest tablets on March 27, and the plaintiff took them as directed on March 28 and 29. Dr. Brown's records indicated that no menstruation had occurred by April 7, 1967, and, according to plaintiff's testimony, none occurred between that date and April 24, the time of the operation.

Mrs. Hoglin returned to the office of Dr. Brown on March 31. The doctor again gave her a pelvic examination and palpation. He then determined to perform a dilation of the cervix and obtain an endometrial biopsy. This procedure is used to obtain lining tissue from the upper uterus for the purpose of laboratory analysis. It can be inferred that one reason for the test was to rule out the existence of pregnancy, although there may have been other reasons as well. In obtaining the biopsy, Dr. Brown noted the existence of a tight stenotic cervix. Dr. Brown submitted the tissue for analysis to the Laboratory of Clinical Medicine at Seattle, Washington. The pathological diagnosis returned to Dr. Brown by Dr. Alex A. Ritzen, a qualified pathologist, was "late secretory endometrium." Late secretory endometrium is a phase of the endometrium tissue which indicates that ovulation has occurred and that the time for menses is approaching. This diagnosis indicates the absence of pregnancy.

Mrs. Hoglin continued to have heavy pain in her pelvis and back, and her menses did not start. Relying upon the results of the endometrial biopsy test, Dr. Brown suggested

that she have a hysterectomy for the removal of the uterus. Hysterectomy is a proper and recognized surgical procedure for a nonpregnant woman who has the condition as diagnosed by Dr. Brown. Dr. Brown also suggested that Mrs. Hoglin seek consultation with Dr. Frank LeCocq, a specialist in Yakima. She declined to seek consultation. On April 24, 1967, pursuant to prior arrangements, she was taken by Dr. Brown, assisted by Dr. Cobb, for the performance of the hysterectomy. After the midline incision was made and the cavity explored, it was noted that the uterus appeared to be a pregnant uterus. Accordingly, the incision was closed, the hysterectomy not performed, and Mrs. Hoglin was returned to her room. During the operation procedures, the urine test was performed, which confirmed the apparent existence of pregnancy.

It later turned out that Mrs. Hoglin was not naturally pregnant in that she suffered from a blighted ovum, and, as a result, she later aborted spontaneously. There was no disagreement below on this matter, and plaintiffs abandoned any claim that she aborted or that a child had been lost by any claimed acts or omissions of Dr. Brown. They nevertheless claimed physical injury to Mrs. Hoglin by reason of what plaintiffs claim was an unnecessary exploratory laparotomy, and also sought damages by reason of claimed emotional problems of Mrs. Hoglin arising out of her belief that her unborn child might have been damaged by the exploratory laparotomy.

The basic issue presented is whether Dr. Brown in his diagnosis and treatment of Mrs. Hoglin violated the applicable standards of care. The court's instructions, not excepted to by either party, defined the applicable standard as follows:

[A] physician who holds himself out as a practicing physician and who must possess and apply the knowledge and use the skill and care which reasonably well qualified doctors in the same type of practice, practicing in the same locality, or in similar localities, ordinarily would use in similar cases and circumstances.

*Cf. Stone v. Sisters of Charity of the House of Providence,* 2 Wn. App. 607, 469 P.2d 229 (1970); *Hayes v. Hulswit,* 73 Wn.2d 796, 440 P.2d 849 (1968).

■ It is well settled that mere misdiagnosis by a physician or surgeon does not necessarily establish liability against him. As stated in *Skodje v. Hardy,* 47 Wn.2d 557, 559, 288 P.2d 471 (1955):

> But a wrong diagnosis is not actionable, unless (1) it was the result of negligence, and (2) it was followed by improper treatment, to the injury of the patient.

A mere difference of professional opinion as to diagnosis or treatment is not enough to establish negligence. There must be " 'an act or omission by the defendant which breaches a standard of care owed by him to the plaintiff, which breach is the cause, both in fact and proximately, of damage to the plaintiff.' " *Stone v. Sisters of Charity of the House of Providence, supra,* at 611, quoting *Hayes v. Hulswit, supra,* at 797. *See also Seattle-First Nat'l Bank v. Rankin,* 59 Wn.2d 288, 367 P.2d 835 (1962); *Just v. Littlefield,* 87 Wash. 299, 151 P. 780 (1915); Annot., 99 A.L.R.2d 1336, § 3(b) (1965). It follows that a non-negligent misdiagnosis followed by an attempted operation properly undertaken on the basis of the diagnosis, creates no liability.

The parties are agreed that it was Dr. Brown's duty prior to performing a hysterectomy to utilize tests and procedures prescribed by the recognized standard of medical practice to rule out the existence of pregnancy. Plaintiffs contend that there are three tests available, namely, Gestest, the urine test, and the bi-manual palpation test, and contend that when the Gestest indicated pregnancy, Dr. Brown should not have commenced the operation without administering one of the other two tests to eliminate the possibility of pregnancy. Defendants contend that Dr. Brown did use the bi-manual palpation test on two occasions and also used a fourth test, namely, the analysis of an endometrial biopsy by a qualified pathologist. It is further contended that such a test is a standard test used by general

practitioners, including Dr. Brown, and commonly relied on by them as a means of determining whether pregnancy is present; that in the instant case, the endometrial biopsy test showed the existence of late secretory endometrium, and that this condition showed nonpregnancy. Defendants assert that, on the basis of the above two tests, the jury could have found that Dr. Brown complied with the applicable standard of care in finding no pregnancy, even though he presumably knew the results of the Gestest, and that they indicated pregnancy.

■ It is true that medical testimony offered on behalf of plaintiffs was to the effect that the endometrial biopsy test was not acceptable to plaintiffs' medical expert who possibly suggested, although not too clearly, that it was not acceptable under the applicable standard of care. As to the latter point, the evidence offered in defendant's behalf was to the contrary. There is evidence that doctors differ as to the tests they prefer, and that the reliability of the tests varies. The evidence being conflicting, the jury had a right to choose the evidence it would believe. The evidence shows that if Dr. Brown's diagnosis was correct, hysterectomy was a proper procedure. The jury had a right to find that Dr. Brown complied with the applicable standard of care by using and relying upon the endometrial biopsy and palpation tests to rule out pregnancy, and that therefore his misdiagnosis was not negligently arrived at. We find no error.

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.