Shelton D. HOOD, Appellant,

v.

Dr. John R. PHILLIPS, Appellee.

No. 7769.

Court of Civil Appeals of Texas, Beaumont.

April 22, 1976.

Rehearing Denied May 27, 1976.

**292**

John Holloway, Houston, for appellant.

Howard S. Hoover, W. N. Arnold, Jr., Sandra K. Foster, Houston, for appellee.

STEPHENSON, Justice.

This is a medical malpractice suit in which a judgment was rendered below for the defendant physician based upon a jury verdict which found, inter alia, that the defendant was not guilty of gross negligence in removing the carotid bodies from the neck as a treatment for emphysema. This appeal by the plaintiff patient is predicated upon his assertions that the trial court should have submitted the case on a theory of ordinary negligence, that records and information concerning the defendant's reputation were erroneously excluded and that defendant made misrepresentations to plaintiff as to the value of the surgery.

The evidence shows that the plaintiff had an advanced case of emphysema when he was first examined by the defendant in 1966, but he was still working. Emphysema is a disease of the lungs for which there is no known cure. The usual treatment for emphysema by the majority of the medical profession is nonsurgical. After consultations with defendant, plaintiff was advised that carotid body surgery might prove beneficial. Defendant performed the operation and removed the carotid body (gland) from each side of the patient's neck together with certain nerves associated therewith. Defendant told plaintiff that the operation was not a cure, but "it is hoped will lessen the spasm [of the bronchial tubes], improve the circulation in the lungs, allow the air to get out, the trapped air to get out so good fresh air can get in." This is a highly controversial procedure, but there is evidence that carotid body surgery is performed by at least one other doctor in Texas, a doctor in Boston, Massachusetts, and doctors in Japan, Poland, and Italy. Until his retirement in 1967, defendant was apparently the only physician in the Houston area who employed this procedure. The defendant stated that eighty-five percent of the some 1,200 persons on whom he has operated derived some benefit, but there is medical evidence in the record that the procedure is generally recognized as having no value in treating emphysema and in some cases may be detrimental to the patient's health.

The plaintiff's first point of error complains of the trial court's refusal to submit his theory that performance of carotid body surgery as a treatment for emphysema was ordinary negligence.

In dealing with this question, we are confronted with the apparently unique issue in this State of the standard to be used when a claim of medical malpractice is based upon a surgical procedure which is allegedly unnecessary. There is *no* assertion here, and there is no evidence to support such an assertion, that the surgery itself was unskillfully or negligently performed—only that it was improper to perform the operation in the first place.

The paucity of cases dealing with the issue of unnecessary surgery has not revealed a consensus of what is the applicable test. Viewing the question in a legal con-

text,[1] the sole issue of what is unnecessary surgery was addressed in *Martin v. Parks*, 165 So.2d 220 (Fla.App.1964). In *Martin*, the attending physician stated that the plaintiff's injury resulting from an automobile accident could only be corrected by performing anterior dissectomy and interbody fusion [on her neck]. The plaintiff asserted that a reasonably prudent doctor would not have performed the operation because it was improper and not necessary. It was the opinion of other neurosurgeons that such an operation was unnecessary. The appellate court affirmed the summary judgment for the defendant because the defendant's conduct did not fall outside the general rule that a neurosurgeon would not be liable in damages for performing surgery, which in the opinion of other specialists was unnecessary and improper, unless in performing such surgery, the neurosurgeon departed from accepted medical practice in the community. *Martin v. Parks*, supra at 220.

It has also been held that a doctor who has failed to keep current on surgical practices and performs an operation that is not generally accepted therapy has failed to meet his duty of care to practice with that degree of knowledge and skill exercised by reasonable surgeons in similar circumstance. *Kelly v. Carroll*, 36 Wash.2d 482, 219 P.2d 79 (1950); *Unnecessary Surgery: Doctor and Hospital Liability*, 61 Geo. L.J. 807, 813 (1973). In *Kelly v. Carroll*, the Washington Supreme Court stated the rule in terms of "generally recognized treatment":

"[I]f there is a reasonable general agreement as to what is the proper medical treatment for a disease or an organic disorder, the question of whether or not the treatment, in a particular case, was correct must be determined by the testimony of expert witnesses from the medical field who alone are qualified to speak.

\*　　\*　　\*　　\*　　\*　　\*

"[I]f he steps out of his limits and undertakes to treat a disorder for which, in the highest level of medical science, there is a generally recognized treatment, such an interloper must be held accountable to the accepted standard of treatment." *Kelly v. Carroll*, supra at 85–86.

Thus, even when a dentist had an option as to methods of treatment, the Massachusetts Supreme Court held that where the dentist used a "less safe" method to anesthetize a patient rather than a better, well-known method, such action constituted negligence and demonstrated a lack of necessary skills. *Vigneault v. Dr. Hewson Dental Co.*, 300 Mass. 223, 15 N.E.2d 185, 188 (1938). The evidence in *Vigneault* revealed that the better, well-known method was the one ordinarily used by dentists in the community. The fact finder in the lower tribunal determined whether the dentist followed the accepted procedure of treatment.

The review of the "options" opened to a doctor, as alluded to in *Vigneault v. Dr. Hewson Dental Co.*, supra, is important because courts have also enunciated a corollary to the above rule that one should follow the "better" method: that where there are several possible methods of treatment, a doctor will not be liable for a patient's injuries as long as the treatment used is one followed by a respectable minority of the medical profession and his care under that treatment conforms with the general practice of reasonable physicians utilizing the same treatment. *Barrette v. Hight*, 353 Mass. 268, 230 N.E.2d 808 (1967); 61 Geo. L.J., supra at 813 (1973); 61 Am.Jur.2d, Physicians & Surgeons, § 147 (1972) and cases cited therein; *but cf. Helling v. Carey*, 83 Wash.2d 514, 519 P.2d 981 (1974).

The difficulty with this rule is in the determination of what constitutes a "respectable minority". Again, no Texas case has been found which provides a definition. However, in *Leech v. Bralliar*, 275 F.Supp. 897 (D.Ariz.1967) it was said:

See *Unnecessary Surgery: Doctor and Hospital Liability*, 61 Geo. L.J. 807, 809–814 (1973).

---

1. We recognize that a distinction must be made as to what is "medically" unnecessary surgery and what is "legally" unnecessary surgery.

"Prolotherapy [injecting a proliferating solution into ligamentous attachments to create a 'weld' and relieve whiplash pain in the neck] as a method of treatment, as espoused and used by . . . a respectable minority of physicians in the United States, cannot be said to be an inappropriate method of treatment or to be malpractice as a matter of law even though it has not been accepted as a proper method of treatment by the medical profession generally." Id. at 902.

In *Leech* the "respectable minority" was composed of sixty-five physicians throughout the United States, who claimed an improvement rate of eighty-five percent. At the time the defendant used the method, prolotherapy was two years old, and was not without critics within the medical profession, including communities which were similar to that where the doctor resided. Treating the issue as a fact question, the district court, without a jury, held the doctor negligent because he varied the treatment—such variations not conforming to the accepted procedures as used by the respectable minority. The clear implication of the case is that had the doctor adhered to the procedures of the minority, albeit a very small minority, he would not have been guilty of malpractice.

■ After reviewing these standards, we think the better rule concerning unnecessary surgery, and one which we adopt, is that a physician is not guilty of malpractice where the method of treatment used is supported by a respectable minority of physicians, as long as the physician has adhered to the acceptable procedures of administering the treatment as espoused by the minority.

■ As in other cases of this nature, the determination should be predicated upon ordinary negligence—what a reasonably prudent physician would do under the same or similar circumstances. See, e. g., *King v. Flamm*, 442 S.W.2d 679, 681 (Tex.1969); *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949); *Fortner v. Koch*, 272 Mich. 273, 261 N.W. 762 (1935); *Leech v. Bralliar*, supra; *Martin v. Parks*, supra. We see no

reason for the standard to be otherwise for an action for unnecessary surgery must be measured by traditional malpractice evidentiary standards. No cases have been found or cited to us which used the test of gross negligence in malpractice suits, and we cannot perceive any rationale which would incorporate such a test.

■ It was error for the trial court to refuse to submit this case on the theory of ordinary negligence. Plaintiff's Point of Error No. 1 is sustained.

■ Plaintiff's next point complains of the trial court's failure to submit requested issues inquiring whether the defendant failed to obtain the consent to the surgery from plaintiff. There is no evidence to support the submission of this issue. Both the plaintiff and Mrs. Hood signed a form which gave the consent to perform the operation. Defendant's duty was to make reasonable disclosures of the risks which were incidental to the treatment. *Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex.1967). The evidence shows that plaintiff and his wife knew generally what procedures were to be involved. The plaintiff does argue that the surgery did not help him and that he would not have consented to surgery had he known this beforehand. But in the absence of a special contract, a doctor does not insure or guarantee results or even that surgery will be beneficial. *Henderson v. Mason*, 386 S.W.2d 879, 882 (Tex.Civ.App.—El Paso 1964, no writ); *Helms v. Day*, 215 S.W.2d 356, 358 (Tex.Civ.App.—Fort Worth 1948, writ dism'd); Perdue, *The Law of Texas Medical Malpractice*, 11 Hous.L.Rev. 1, 27 (1973). The evidence supports the conclusion that plaintiff was told that only about eighty-five percent of defendant's patients benefited from surgery. Point of Error No. 2 is overruled as being without merit.

■ Plaintiff next asserts error in the trial court's action in quashing subpoenas requiring the defendant to produce records in his possession of surgery he performed on other patients, and in quashing subpoenas to the Executive Secretary of the Har-

ris County Medical Society to produce certain records of the Board of Censors.

Tex.Rev.Civ.Stat.Ann. art. 4447d, § 3 (Pamp.Supp. 1974–1975) provides in part:

"The records and proceedings of any hospital committee, medical organization committee or extended care facility committee established under state or federal law or regulations or under the by-laws, rules or regulations of such organization or institution shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and *shall not be public records and shall not be available for court subpoena.*" (Emphasis supplied)

The meaning of the statute is clear and unambiguous. The evidence requested by plaintiff was not available to him. See *Karp v. Cooley,* 493 F.2d 408, 425–426 (5th Cir. 1974). It was also immaterial since it related to matters which were collateral to this particular cause of action; i. e., surgery which had been performed by the defendant on other patients. *Goodnight v. Phillips,* 458 S.W.2d 196, 199–200 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n. r. e.).

Plaintiff Points of Error Nos. 3, 4, and 5 are without merit and are overruled.

Having found error in the submission of this cause, we find it unnecessary to consider plaintiff's remaining points.

Because it is necessary to remand this case, we think it pertinent to make additional comments on issues which will probably arise upon retrial relating to the standard or test which we have adopted. *Indemnity Ins. Co. of North America v. Williams,* 129 Tex. 51, 99 S.W.2d 905 (1937).

■ As alluded to earlier, we again emphasize that we are not dealing with those procedures which might be termed either "experimental" or progressive surgery.[2] This opinion and the rule enunciated should not be construed as being applicable to phy-

sicians who perform and adhere to valid surgical procedures which legitimately seek to advance medical knowledge in areas which are as yet unexplored or not adopted. Where, as here, the pleadings and the evidence reveal that the cause of action is not based upon either experimental or progressive surgical techniques, the jury should be instructed that these issues are not involved in the case—in effect carving out an exception to the rule as adopted.

The procedure in our case is not experimental or progressive surgery, at least as is reflected in our present record. The present weight of the evidence is that the medical community has rejected carotid body surgery as a treatment for emphysema as being of no or little value and unnecessary. There is supportive expert testimony in the case at bar that definitively states that such surgery is useless, that it could not possibly benefit a patient with advanced emphysema, that there is no medical justification for such surgery, and that such procedure would be "falling below the minimum standards of medical treatment in the treatment of emphysema." There is also testimony that removal of the carotid body eliminates a regulatory factor of the oxygen in the blood and that such surgery may damage nerves which control the tongue and/or face. There is further evidence that this procedure is currently used by six physicians in the entire world. It is noteworthy that this is not a new technique. This procedure was first developed in 1961. Thus, the medical profession has apparently had sufficient time in which to evaluate the credibility of the procedure. In light of the above evidence, an issue was raised as to whether the surgery here was "unnecessary" and such determination is to be made by the trier of fact.

■ Further, the issue of whether the doctor is part of a "respectable minority" of physicians who adhere to the particular procedure as espoused by that minority should be submitted, where supported by the evi-

---

2. For a discussion of experimental surgery and its attendant liabilities, see e. g. *Karp v. Cooley,* 493 F.2d 408 (5th Cir. 1974).

dence, to the trier of fact after hearing testimony from experts in the field.

Finding error in the court below, the judgment is reversed and the cause remanded to the lower court for a new trial.

REVERSED AND REMANDED.

DIES, Chief Justice (dissenting).

I respectfully dissent.

I would affirm the judgment of the trial court. In my judgment the evidence does not raise an issue of malpractice (ordinary negligence) by Physician.

Patient had a severe and incurable case of emphysema. He had been treated conservatively (medically) and his condition continued to worsen. He was told that the carotid surgery would not cure him but hopefully would make it easier for him to breathe. There is no evidence the surgery made his condition any worse. He lived some six years after the surgery; there is no evidence his death was in any way connected with the surgery. There is no allegation or evidence of unskillfulness in the surgery on the part of Physician. Thousands of these operations have and are being performed. Some patients report improvement from the surgery.

After diligent research, I am unable to find any case in America holding a physician guilty of malpractice under these circumstances.

Three physicians testified for the Patient. One, Dr. Longfield, based his conclusions that "[t]he main findings we made, there was no benefit from the operation" on ten patients. Another doctor, Dr. Thomas, testified, "The only thing I can say is what I have read and what I have heard at conventions." admitted he didn't "know anything about the operation."

The third physician, Dr. Petty, from Denver, testified by deposition, but the deposition does not reveal whether he ever had any direct experience with the operation or examined patients who had undergone carotid surgery.

The majority opinion would absolve Physician if (1) the operation were experimental or (2) if a "respectable minority" of physicians supported it.

This rule brings into mind these questions: (1) When does surgery stop being experimental and (2) how many is a "respectable minority"?

This surgery, of course, as the majority opinion states, cannot be considered "experimental," because thousands of these operations have been performed. There is no showing that the surgeons who performed them are not a "respectable minority."

After a procedure is no longer "experimental" and until a "respectable minority" is accumulated, those physicians who use a new procedure do so on their own peril. This rule must surely inhibit and discourage new treatments and procedures.

Texas law presumes initially that physicians have discharged their duty to the patient which presumption can be defeated only by an affirmative showing of a specific breach of duty resulting in injury. Walker, Parker, and Williamson, *The Application of Res Ipsa Loquitur in Texas Medical Professional Liability Actions,* 12 Hous.L.Rev. 1045 (1975). Error in judgment by Physician is not a sufficient showing. *Harle v. Krchnak,* 422 S.W.2d 810, 814 (Tex.Civ.App. —Houston [1st Dist.] 1967, writ ref'd n. r. e.). Negligence is never imputed from unsatisfactory results. *Hunter v. Robison,* 488 S.W.2d 555, 560 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.); *Floyd v. Michie,* 11 S.W.2d 657, 658 (Tex.Civ.App.—Austin 1928, no writ); see also *Hopkins v. United States,* 152 F.Supp. 473, 476 (W.D.Mo.1957).

The law must recognize that by the nature of medicine there will always be differences of professional opinion as to diagnosis and treatment. See *Hoglin v. Brown,* 4 Wash.App. 366, 481 P.2d 458, 461 (1971). See also *Schueler v. Strelinger,* 43 N.J. 330, 204 A.2d 577, 584 (1964). See also: 70 C.J.S. Physicians and Surgeons § 48 at 959 (1951).

Unnecessary surgery is a very serious problem in America. See *Unnecessary Surgery: Doctor and Hospital Liability,* 61 Geo. L.J. 807 (1973).

But I question whether the way to correct it is by opening a new area of malpractice (as this opinion does) or by vigorous self-regulation by the medical profession. If the courts get into this problem some genuine abuses, of course, will be revealed, but I fear the long term effect would discourage new procedures and techniques, so necessary to improve health care. I want to emphasize that this dissent is strictly limited to the facts of this case, viz., where the procedure is thought by some physicians to be of help, where there is no showing of unskillfulness on the part of the physician, and where there is no showing of injury to the patient other than the normal injury attendant with any surgery.