Cecile M. VARGA, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1159–NN.

United States District Court, E. D. Virginia, Newport News Division.

March 7, 1969.

Israel Steingold, Norfolk, Va., Charles H. Gordon, Hampton, Va., for plaintiff.

Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., Lawrence Klinger, Atty., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Alleging malpractice on the part of two doctors employed by the defendant and acting within the scope of their employment, this action is maintained under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Plaintiff, at all pertinent times, was a dependent of a serviceman and, as such, entitled to receive medical treatment at the hands of the defendant.

Plaintiff visited the Langley Air Force Base Hospital on October 14, 1964 where she was seen by Dr. Brandt of the Department of Internal Medicine. A history of her complaints was taken.[1] On reference to Dr. Erickson of the OB-GYN Department pursuant to a request dated October 21, 1964, the following appears in the consultation report signed by Dr. Erickson on October 27:

"Pt. is 39 yr. old WF—5 yr. * * * of progressive stress incontinence. Wears peripad constantly. Has tried exercises but to no avail. Exam reveals normal pelvis except marked cystourethrocele. Feel pt. should have surgical correction however with above problem some inherent risk involved. Would therefore appreciate talking to you in more detail about patient. Thank you for referring pt."

On the same date, October 27, 1964, certain information in Dr. Erickson's handwriting reveals an entry testified to by Dr. Erickson:

"The patient is a thirty-nine-year-old white female, gravida 10, para 2, aborta 7, one tubal pregnancy, with two living children, whose last menstrual period was October 21st. The patient has been bleeding since then. Patient, until three months ago, had cycle every twenty-eight days, with four days of flow. The patient, for the last three months, has had bleeding every other week, with flow for six days; has chronic bronchitis and pulmonary emphysema. Cough seems to bring on period; has back ache with period. Patient quite tense and nervous person, with tension headaches. Patient has taken hormone shots (one

---

1. Plaintiff's major complaint related to her excessive coughing. However, she apparently told Dr. Brandt sufficient to make him feel that she should be referred to an OB-GYN consultant "for her complaint of stress incontinence."

weekly—not helped). Since 1959, when patient had kidney infection, has had stress incontinence, always wears a pad. Cough or strain, losing water, feeling of things falling out, not able to hold water long time. No dysuria, pyuria, hematuria or frequency."

With this history and Dr. Erickson's examination, the impression was stress incontinence and third degree cystourethrocele.

Plaintiff was next seen by Dr. Brandt in the medical clinic on November 25, 1964. As plaintiff had stopped smoking her cough had disappeared. Dr. Brandt reported that she could accept general anesthesia without any difficulty. Drs. Erickson and Brandt conferred generally with respect to plaintiff's condition and her ability to withstand an operation.

On January 13, 1965, Dr. Erickson again examined plaintiff with Dr. Petri, and noted on the chart, "Physical examination done.[2] Surgery for Thursday, the 27th.[3] Abdominal hysterectomy—M-M-K." Plaintiff was admitted to the hospital on January 20 in anticipation of surgery the next day. Another history was taken upon admission indicating certain additional information to the effect that she had a tubal ligation on the right side opposite the tubal pregnancy following the birth of her second child, and a uterine suspension (Baldy-Webster) had been done in 1956 while in New Jersey. The pre-surgical diagnosis was a first degree uterine prolapse, a third degree cystourethrocele, and stress incontinence.

The Marshall-Marchetti-Krantz (M-M-K) procedure with an abdominal hysterectomy was performed on January 21, 1965 by Dr. Erickson who was *not*, at the time, a board certified gynecologist. However, Dr. Petri, a board eligible obstetrician and gynecologist, directed each step of the procedure and was present in the operating room at all times. During the course of the operation Dr. Erickson inadvertently sutured the bladder to the posterior peritoneum and, a few days thereafter, a vesicovaginal fistula developed. Later efforts to clear up the fistula without surgery were to no avail and on April 21, 1965, plaintiff submitted to surgery at the Portsmouth Naval Hospital for the repair of the fistula. In January, 1966 it became necessary to do a repeat M-M-K procedure at the same hospital.

Plaintiff contends that (1) Dr. Erickson was not qualified to perform the ' operation and procedures undertaken on January 21, 1965; (2) the suturing was negligence; (3) the selected surgical procedures were not justified; and (4) negligence was established by reason of leaving a pack in the vagina following the operation. While we agree with plaintiff's fourth contention, limited to that fact, we disagree as to the first, second and third points advanced.

### Qualifications of Surgeon

Dr. Erickson graduated in June, 1963, from the State University of Iowa Medical School. He served a rotating internship at Emanuel Hospital, Portland, Oregon, and thereafter spent three months in a general surgery residency at the same hospital. He reported to Langley Air Force Base Hospital on September 18, 1964. His rank was that of captain.

Dr. Erickson had scrubbed, assisted and actually performed abdominal hysterectomies. While he had also scrubbed and assisted in M-M-K procedures, he had never previously performed same. Dr. Petri, the board eligible obstetrician and gynecologist, was present at all times during plaintiff's operation and assumed full responsibility for the completion of the surgery in accordance with the proper standards. Dr. Petri, in fact, directed

---

2. A stress incontinence test was performed at this time in accordance with an accepted procedure. Dr. Petri states that he was present at the time. Plaintiff indicates to the contrary.

3. The date is incorrect. The correct date of the scheduled operation according to the chart was January 21, 1965.

Dr. Erickson where to insert the needle during the M-M-K procedure.

Dr. Krantz, one of the originators of the M-M-K procedure and undeniably one of the outstanding teachers in the obstetric and gynecology field, testified that Dr. Erickson's qualifications were adequate under the circumstances. The suturing, which was the operative element giving rise to the fistula, is done throughout the country by interns and junior residents. Both Dr. Sacher, former Chief of Urology at the Portsmouth Naval Hospital, and Dr. Wolcott, a board certified OB-GYN from Norfolk, testified that suturing would be permitted and expected by a man of Dr. Erickson's qualifications.

Plaintiff's expert, Dr. Inloes, disagrees although he concedes that first year residents are permitted to perform major surgery.[4] It is unclear exactly how he arrives at the conclusion that Dr. Erickson was not qualified for the operative procedures when supervised by a board eligible OB-GYN. At one point Dr. Inloes testified that "all hospitals have required board certification or qualified to take the board in your specialty to practice surgery" and that the qualifications were "three years in an accredited program of obstetrics and gynecology." At another time he indicates that a physician of Dr. Erickson's qualifications would be permitted to operate in a civilian "teaching hospital"[5] under the supervision and with the assistance of a board eligible gynecologist. Further, while Dr. Inloes served as Chief of the OB-GYN service at Langley Air Force Base Hospital from 1951 until June 1953, doctors attached to the service frequently performed operations with the assistance of Dr. Inloes, even though not board eligible or board certified. Since Langley Air Force Base Hospital is not a "teaching hospital" as defined by Dr. Inloes, it is apparent that Dr. Inloes is rather vague as to the customary standard in the community. Dr. Wolcott, whose practice is essentially confined to civilian community hospitals, testified that there was no reason why Dr. Erickson should not have been permitted to place the sutures, as long as the board eligible or board certified gynecologist was present and supervising same. In fact, Dr. Wolcott points out that it is next to impossible for one surgeon to perform the operation, and that at all times there must be an assistant present.[6] As the complexities of the operation are described by Dr. Wolcott, Dr. Krantz and referred to on the operation report, it is readily apparent that, except under emergency circumstances, no lone surgeon could perform the operation.

To accept plaintiff's theory would result in a requirement that two board eligible or board certified gynecologists would attend every operation involving an abdominal hysterectomy or, in the alternative, that the board eligible or board certified gynecologist must do all the suturing. The first suggestion is hardly worthy of discussion as we recognize that resident surgeons or interns universally are assigned to assist the more experienced board eligible or board certified specialist in the field. As to

---

4. Dr. Inloes was at one time at Langley Air Force Base Hospital and permitted non-board eligible surgeons to assist him in OB-GYN operations. On one occasion he permitted two non-board certified doctors to perform an operation and he did not even scrub for the procedure, but was later called upon to assist after the patient went into cardiac arrest.

5. A "teaching hospital" is denominated by Dr. Inloes as having a graduate teaching program for the education of those in a residency program. However, Dr. Krantz testified that all hospitals may be considered in the category of "teaching hospitals" under modern-day surgery. We need not determine which doctor is correct.

6. The Court rejects the inference to be drawn from Sergeant Varga's testimony to the effect that Dr. Petri admitted that he was not present during the operation. The record reflects the presence of Drs. Erickson and Petri. Also rejected is plaintiff's statement attributed to Dr. Petri that "he wasn't there when it happened"; that "he had to be called out."

the second alternative, the record is replete with questions propounded by the Court to the experts in anticipation that an expert would express the opinion that, because of the known hazard, the more experienced surgeon was better qualified to do the suturing. The credible evidence leads conclusively to the belief that the accepted community standard is to the effect that the resident surgeon is equally qualified in performing the task of suturing even where the abdominal hysterectomy is coupled with an M-M-K procedure.

### The Inadvertent Suturing

The record reflects that even the most competent board certified gynecologists will be confronted with inadvertent suturing of the bladder while performing like operations. Statistics indicate only a minimal percentage of such incidents, but it is nevertheless not uncommon and is a recognized hazard in the medical profession. As a vast majority of situations will not result in a fistula, or is otherwise repaired through a normal process, it is quite likely that the true percentage of inadvertent suturing is not reported. Because of the very nature of the operation and the requirement of working in a confined area, the surgeon doing the suturing is severely handicapped and medical science has not yet developed a procedure which will eliminate the calculated risk. As in Clark v. United States, 402 F.2d 950

(4 Cir., 1968), where the parties conceded that there was no negligence involved in the inadvertent suturing of the ureter, we find that, in the present case, there was no negligence in suturing the bladder during this operation as the community standard indicates that the same unfortunate incident may arise with the best qualified in the profession.[7] While plaintiff's counsel stresses the fact that witnesses referred to the suturing as a "mistake," this does not establish negligence as the duty owed is that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities at the time. Reed v. Church, 175 Va. 284, 8 S.E.2d 285 (1940).

### The Selected Surgical Procedures

Plaintiff's expert, Dr. Inloes, urges that her condition, as it existed prior to the operation on January 21, 1965, readily could have been corrected by proceeding through the vagina and avoiding the abdominal hysterectomy. Acknowledging that such a procedure is an accepted method in correcting stress incontinence in certain women, the credible evidence abundantly establishes the wisdom of selecting the abdominal route as to this plaintiff. Her prior medical history supports vividly the conclusion reached by Dr. Erickson after consultation with Dr. Petri. Indeed, every expert other than Dr. Inloes testified that the abdominal hysterectomy coupled with

7. We do not base this conclusion upon any "average judgment". To the contrary, it is predicated upon the premise that, irrespective of the degree of care used, there will be occasional instances of inadvertent suturing by the best qualified gynecologists in the field. Hicks v. United States, 368 F.2d 626 (4 Cir. 1966), is inapposite. We are unable to agree with plaintiff's argument that inadvertent suturing performed while exercising the highest degree of care is comparable to leaving a foreign substance in an operative wound. Easterling v. Walton, 208 Va. 214, 156 S.E.2d 787 (1967) ; 41 Am.Jur., Physicians and Surgeons, § 97, p. 213. The latter carries with it a clear implication of negligence calling for the invocation of the *res ipsa loquitur* doctrine. The former simply involves a hazard of the operation which has not, as yet, been solved by medical science or any degree of care exercised by the surgeon. Physicians do not and cannot guarantee successful results, and only owe their patients ordinary but expert care, attention and skill such as is usually exercised by reputable physicians in similar cases. Ropp v. Stevens, 155 Va. 304, 154 S.E. 553 (1930). A bad result, standing alone, is not sufficient to raise an inference of negligence. Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661 (1940). For a discussion of a case where a vesicovaginal fistula was created, without negligence, during a hysterectomy, see: Siverson v. Weber, 57 Cal.2d 834, 22 Cal.Rptr. 337, 372 P.2d 97 (1962).

M-M-K procedure was the only appropriate selection under the circumstances of this case. Even Dr. Inloes agrees that the M-M-K operation is the most widely used and consistently effective procedure for the correction of anatomic abnormality of stress incontinence.

As Dr. Wolcott said when questioned as to the wisdom of selecting the abdominal hysterectomy coupled with the M-M-K procedure: "It is the only—that is the only operation you can do as far as I am concerned. There is no other way that I could do the procedure." The record is replete with evidence substantially establishing the appropriateness of the selected operation and procedure.

### The Pack in the Vagina

■ During the course of the operation it became necessary to insert a pack in the vagina. Under proper post-operative procedure this pack would have been removed at the conclusion of the surgery or, at the latest, within one or two days thereafter. Plaintiff was discharged from the hospital on January 27, 1965. Because of leaking straw-colored fluid from the vagina, plaintiff returned to the clinic on January 31, 1965 and was examined by Dr. Petri. At that time Dr. Petri discovered the pack or sponge and proceeded to remove same.

There can be no doubt as to the negligence in failing to remove the pack within a reasonable period following the completion of the surgery. Indeed, the defendant concedes its negligence in this regard. The sole question is whether plaintiff sustained any compensable damages under the circumstances.

■ It was the unanimous opinion of all doctors that the presence of the sponge in the vagina did not cause, irritate, or aggravate the fistula.[8] A review of the transcript with respect to the testimony of plaintiff and her husband indicates that no questions were propounded by counsel to either witness regarding the pack in the vagina, the removal of same, or the foul odor which it created. We doubt whether anything was said by Dr. Petri to plaintiff or her husband about the sponge, presumably because Dr. Petri knew that it caused no material damage, and the negligent leaving of the pack in the vagina was probably first discovered when plaintiff's counsel and his expert were granted leave to examine the hospital records. Nevertheless, we believe that plaintiff, and probably her husband as well, must have detected the foul odor and plaintiff perhaps erroneously assumed that the odor emanated from the pad she was wearing during the post-operative period.

For the embarrassment and inconvenience occasioned by the pack being left in the vagina, plaintiff is entitled to an award of Two Hundred Dollars ($200.00).

Counsel for defendant will prepare and present a judgment order in the sum of Two Hundred Dollars ($200.00), plus interest from the date of said judgment order as provided by law, together with taxable court costs, said recovery being limited to that portion of the claim which is based upon the pack being left in the vagina. In all other respects, the plaintiff's claim must be dismissed.

The order to be entered shall first be presented to counsel for plaintiff for inspection and endorsement.

8. A review of Dr. Inloes' initial testimony on direct examination would give one the impression that the presence of the sponge aggravated or contributed to the fistula. When recalled as a rebuttal witness, he finally admitted that the sponge was in no way related to the fistula.