**Lucy E. SAWYER, Administratrix of the Estate of William O. Sawyer, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 77–718–N.**

United States District Court, E. D. Virginia, Norfolk Division.

Nov. 20, 1978.

Leonard D. Levine, Virginia Beach, Va., for plaintiff.

John F. Kane, Asst. U. S. Atty., Alexandria, Va., Laurence A. Froehlich, Business and Administrative Law Division, Dept. of HEW, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KELLAM, Chief Judge.

Plaintiff seeks to recover damages from the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2672 and other provisions of Chapter 171 of that Title, the procedure for which is prescribed by 28 U.S.C. § 2401, jurisdiction for which is found in 28 U.S.C. § 1346, based on the alleged negligence of the United States in the care and attention of plaintiff's decedent, who was a patient of the United States at the United States Public Health Service Hospital in Norfolk.

## I.

Plaintiff's decedent was injured in an automobile accident in Virginia Beach, Virginia on November 6, 1976. He was transported to Bayside Hospital in Virginia Beach, where he remained as an inpatient [part of the time in intensive care] until November 18, 1976, when, at decedent's request, he was transferred by ambulance to the United States Public Health Service Hospital at Norfolk, Virginia. He remained there until November 28, 1976, when he died.

Plaintiff's decedent had suffered severe injuries in his accident, including the fracture of more than one vertebrae of his back, resulting in injury to his spinal cord. Following two major surgical procedures, the fractured vertebrae were fused and portions of the bone pressing on the spinal cord and nerves were removed. Even so, he was almost totally paralyzed in his lower extremities. At the time of his request to be transferred to the Public Health Service Hospital, he was placed in a plaster of paris cast extending from his neck and shoulders down to his middle or lower abdomen at his hips. The principal purpose of placing him in the cast was to stabilize his back position [vertebrae which had been fused] so that he could be transferred to the Public Health Hospital. At that time his condition was stable and he was regaining his functions. His condition required intensive nursing care and special medical attention.

Soon after he was received at the Public Health Service Hospital the physician who was in charge of the decedent's care and attention sought to have him transferred to a Spinal Cord Injury Center. He asserted such a facility existed at Staten Island. The mother of the decedent opposed such a transfer and the physician then sought to have him transferred to the Veterans Administration Hospital at Kecoughtan. He pursued such endeavor and a day or two before the decedent died, he had arranged for such transfer to take place on November 28th or 29th.

At the time the decedent entered the Public Health Service Hospital he was on numerous types of medication, some of which were continued, in larger or smaller dosages, and in addition, other types of medication were prescribed.

Not unexpectedly, the decedent resisted the cast. He complained numerous times. The physician under whose care he came said that he had mental problems, thought someone was trying to kill him, and asserted people were putting knives under his cast. That physician related he saw him only a few times when the patient was normal and able to carry on a conversation, although the record shows that numerous others carried on normal conversations with him and were able to understand his complaints.

Plaintiff asserts that the cause of death of her decedent was negligence on the part of employees of defendant, resulting in a lack of proper care and attention, and particularly by the physician who was in charge of his care. She asserts the care and attention did not meet the standards required of such institutions in the community or of physicians in the community.

The records from the Bayside Hospital, where plaintiff's decedent was first confined, and from the Public Health Service Hospital, have been introduced in evidence in this case, along with other exhibits. Testimony of the attending physicians at the Bayside Hospital and physicians at the Public Health Service Hospital were presented, either in person or by depositions. The relevant evidence will hereafter be set out. First, we look at the law which will govern the determination of the issue of liability.

## II.

To recover in this action under the Federal Tort Claims Act, the plaintiff must establish negligence or a wrongful act or omission of an employee of the United States, without which showing of negligence the alleged conduct is not actionable under the Act. *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); *Dalehite v. United States,* 346 U.S. 15, 45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The liability of the United States under the Act is "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and is to be determined by the standard of whether "a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The alleged negligence and malpractice which are the bases of this suit and the resulting injury, occurred in Virginia; hence, the law of Virginia is to be applied. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 808 (1963); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Massachusetts Bonding & Insurance Co. v. United States,* 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956); *Jennings v. United States,* 374 F.2d 983 (4 Cir. 1967); *Murray v. United States,* 329 F.2d 270 (4 Cir. 1964).

When an agency of the United States undertakes a task, it must perform the task with due care. *Rogers v. United States,* 397 F.2d 12 (4 Cir. 1968). The law of Virginia accords with this principle. *City of Richmond v. Virginia Bonded Warehouse Corp.,* 148 Va. 60, 138 S.E. 503, 507. A party is entitled to assume another party will perform his duty, and may act upon such until the contrary appears, or reasonably should appear. *Harris Motor Line v. Green,* 184 Va. 984, 37 S.E.2d 2 (1946). The issues of negligence and proximate cause in actions like this are to be determined from the evidence by the trier of the facts. *Biggs v. Martin,* 210 Va. 630, 172 S.E.2d 767 (1970); *Talley v. Draper Construction Co.,* 210 Va. 618, 172 S.E.2d 763 (1970); *Iatomasi v. Rhodes,* 403 F.2d 498 (4 Cir. 1969); *Nuckoles v. F. W. Woolworth Co.,* 372 F.2d 286 (4 Cir. 1967). In *Clark v. United States,* 402 F.2d 950 (4 Cir. 1968), the court said that it "appears to be settled in Virginia that the question of causation is for the trier [jury]

- - -

In order for defendant's negligence to be a proximate cause of the injury, it is not necessary that defendant "shall have forseen the precise injury that occurred," but, it " 'is sufficient if an ordinary, careful and prudent person ought, under the circumstances, to have foreseen that an injury might probably result from the negligence act'." *Cox v. Mabe,* 214 Va. 705, 204 S.E.2d 253 (1974).

To determine whether the actions or omissions of defendant establish negligence on the part of the defendant in the care, attention and treatment given plaintiff's decedent, and whether there is liability under the Federal Tort Claims Act, we turn to the law of Virginia.

■ The standard of care prescribed for physicians in Virginia is "that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities·at the time." *Reed v. Church,* 175 Va. 284, 8 S.E.2d 285, 288 (1940); *Clark v. United States, supra, Morgan v. Schlanger,* 374 F.2d 235, 241 (4 Cir. 1967), and "the standard of care required of specialists in Virginia is that of other like specialists in good standing in the same or similar localities." *Little v. Cross,* 217 Va. 71, 225 S.E.2d 387, 390 (1976). In *Bly v. Rhodes,* 216 Va. 645, 222 S.E.2d 783, 788 (1976), *reaffirmed in Little v. Cross, supra,* the court stated it this way:

In Virginia, at least since 1918, when we decided *Hunter v. Burroughs, supra,* 123 Va. at 131, 96 S.E. at 366, the standard of due medical care applicable to specialists has been that of "other like specialists in good standing, in the same or similar localities as defendant." We reiterated this rule in *Fox v. Mason,* 139 Va. 667, 671, 124 S.E. 405, 406 (1924), where we set out the "same or similar community" standard applicable to physicians and surgeons and then said, "[t]he rule is the same as to specialists."

*Clark v. United States, supra,* sets forth that the court in *Reed v. Church, supra,* sustained an instruction to the jury applying the above set out standard to diagnosis, as well as treatment, saying that under certain circumstances, "failure to make [this] investigation constitutes a lack of due care on the part of the physician." *Hicks v. United States,* 368 F.2d 626, 630 (4 Cir. 1966).

■ A physician holds himself out as possessing knowledge and ability necessary to the effective practice of medicine and impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill which is ordinarily possessed by physicians in the locality in ·which he practices and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of the practice of medicine. *Varga v. United States,* 314 F.Supp. 671 (D.C.Va.1969), *aff'd,* 422 F.2d 1333; *White v. United States,* 244 F.Supp. 127 (D.C.Va.1965), *aff'd,* 359 F.2d 989; *Hicks v. United States, supra.*

■ The mere fact a diagnosis was erroneous does not furnish a basis for liability. Bad results, standing alone, are not sufficient to raise an inference of negligence on the part of a physician or surgeon. A physician is not an insurer of the patient's cure, and a failure to effect cure does not raise a presumption of negligence. *Vann v. Harden,* 187 Va. 555, 47 S.E.2d 314; *Hicks v. United States, supra; Varga v. United States, supra.* But there is a distinct difference in an error of judgment in diagnosis and treatment, as opposed to a failure to properly examine, treat and make use of aids to diagnosis. The Fourth Circuit put it this way in *Clark v. United States, supra,* at p. 953:

That the diagnosis was erroneous does not, of course, furnish a basis for liability, but "there is a vast difference between an error of judgment and negligence in the collection and securing of factual data essential to arriving at a proper conclusion or judgment. If a physician, as an aid to diagnosis, i. e., his judgment, does not avail himself of the scientific means and facilities open to him for the collection of the best factual date upon which to arrive at his diagnosis, the result is not an error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis or judgment." *Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167, 173 (1963). See also, *Hicks v. United States,* 368 F.2d 626, 630 n. 1 (4 Cir. 1966).

In *Hicks v. United States, supra,* the court, after holding a failure to make an investigation constituted a lack of due care on the part of the physician, continued at p. 630:

It was stated in *Kelly v. Carroll,* 36 Wash.2d 482, 494, 219 P.2d 79, 86, 19 A.L.R.2d 1174 (1950), *cert. denied,* 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 646 (1950), a case in which an erroneous diagnosis had led to improper treatment, that "if there was a possibility that it was appendicitis, he [defendant] had no right to gamble with [decedent's] life, on the theory that it might be something else."

In *Hicks,* the court further said that "only if a patient is adequately examined, is there no liability for an erroneous diagnosis." 368 F.2d 630. Footnote 1 of that decision recites numerous cases in support of the fact "that a physician has a duty to make proper use of all available diagnostic aids to establish a firm basis for the diagnosis and choice of treatment." Here, the principal complaint is not an error of judgment, but a failure to act.

### III.

▮▮ Plaintiff asserts the record clearly establishes that the defendant was negligent by acts of omission and commission. She asserts the evidence abundantly establishes

(a) a failure to make proper and timely physical examination of the patient

(b) a failure to make adequate and proper laboratory tests of the patient

(c) a complete failure to make any type of examination of the patient within the last 24 to 48 hours before his death

(d) improperly prescribing medication, prescribing and changing medication and dosages without any physical or visual examination of the patient or a proper review of his chart.

Plaintiff's decedent had sustained severe injuries and was clearly not out of danger when he was transferred to the Public Health Service Hospital. But his condition was stable, the back had started to fuse, he was regaining his functions, his vital signs were stable and satisfactory, he showed improvement in his lower extremities, he was free from infection, and his prognosis was good.

But, he was not out of danger. His condition required intensive care by doctors and nurses. He was a potential candidate for infections and complications of the lungs was a possibility. He had multiple problems and complications which had to be followed. His injuries and condition required that doctors physically examine him daily, and have proper laboratory tests run and make regular evaluations of his condition. They should be on guard for lack of gastro-motility, necessitating, among other things, palpation of the stomach. He was described as difficult to treat, but not difficult to handle.

### A.

As a result of the loss of the use of his lower extremities decedent required substantial medication and the intake of a great quantity of liquid. Much of this was necessary to keep his bladder and bowels functioning. A catheter remained in him during his stay at Public Health Service Hospital to drain his bladder. He was given quantities of medication and numerous enemas to keep his bowels functioning. The catheter presented a real danger of infection.

Strong medications were prescribed for him, some to assist him with bowel movements, to quiet his nerves, for pain, for infection, and for other reasons. It was increased and changed several times. Some of the medication was prescribed and dosages reduced or increased by the physician without an examination or even viewing the patient; that is, by answer to a telephone call from one of the nurses.

It would serve no good purpose to attempt to set forth each day's record of the patient's treatment and the little attention given by the physician. With the cast covering the upper portion of the patient's body, the doctors seemed to agree it was difficult, if not next to impossible, to listen to the patient's heartbeat or sounding of his lungs, or to examine other portions of the upper body. Even with the cast on, they could make examinations and palpation of the lower abdomen by inserting the hand under the cast. But this was not done.

### B.

█ More important and necessary in order to meet the standard of care due such a patient, suffering as he was, was a requirement that holes should have been cut in the cast over the heart and lungs and portions of the stomach, in order to permit a complete and full examination. The evidence seems to clearly establish that the standard of care in the community required this and if there was any difficulty in making the examinations in that manner, then the standard of care in the community required that the cast be removed completely so that the examinations could be made. The removal could be done by cutting the cast along each side, lifting off the top and removing the bottom half, and after the examination had been completed by replacing it and taping it together. It should be noted that this was done by the Public Health Service Hospital physicians about an hour before the patient expired and at a time when he was in extremis. It was just too little too late.

The credible evidence established that the standard of care of physicians in the community required at least daily physical examination of the patient, listening to the heart and lungs, and palpation of the stomach. Palpation of the stomach in cases like this was very important to determine whether the stomach and gastric system was properly functioning, and if not, to take immediate measures to correct it. There was real danger if this was not done.

From the day following the patient's admission to the Public Health Service Hospital, until his death, he was not given an examination by any physician either to test the condition of his heart, lungs or stomach, nor were there adequate and proper laboratory tests run or other examinations made for his care and attention. It seems the only tests ordered were those ordered in the absence of the patient's attending physician by another doctor who went in to examine or discuss with the patient his mental condition. This was on the day before the patient died, and such tests were not even scheduled to be made until Monday, November 28th. The patient died on the 27th.

### C.

Dr. Loxley, an orthopedic surgeon, reviewed all of the records from each of the hospitals, the autopsy report and other data available. He testified the evidence clearly showed the decedent was regaining functions at the time he was removed from the Bayside Hospital; that the condition of the patient required that a physician must be on guard to determine if there was any loss of gastro-motility; that numerous means were available for making such determination and particularly one of feeling the stomach and abdomen by inserting the hand under the cast and if there was any difficulty or restriction, by cutting off part of the cast, or removing the cast entirely; that the record established there was no proper examination to determine the gastro-motility of the stomach and abdomen on the day before the patient died, or for several days before that; that such an examination was necessary; that no proper evaluation was made of the patient; that it was clear his stomach was not working and was filled up and distended, and his bowels were swollen. Dr. Loxley further testified that the records clearly demanded the cast should have been removed on the day before the patient expired, and that if an examination had been made, in his opinion the patient could have been saved. He said mere filling and distension of the stomach would have alerted a physician exercising due care to the condition which brought about his death; namely, the fact that the stomach was filled and distended, leading to vomiting. Death was caused, in his opinion, by aspiration of the vomit into the lungs, causing pneumonia and causing them to swell and cut off the intake of air. Most of the doctors who testified said that this was the normal result in cases similar to this and that a physician should be on guard to avoid this. He further said that vomiting was a signal to the physician to make an examination of the stomach. The patient had had spells of vomiting on Saturday before he died on Sunday, and even prior to Saturday. Yet, there was no palpation of the stomach on

Saturday. Dr. Butts said the patient required intensive care by doctors, and nurse Stainback said the patient, on numerous occasions, complained of stomach cramps and stomach pains. This should have alerted the physician to examine the stomach.

The evidence established it was common knowledge in the medical community that a full and distended stomach was likely to lead to vomiting and often to aspiration. Added to this danger was a patient who had little or no use of his lower extremities, and enclosed in a cast from neck to the lower part of his abdomen. Dr. Loxley described the treatment and care as deplorable. In his opinion, the patient would have recovered and been able to resume a normal life, limited, in all probability, by only not being able to climb, but otherwise perform the normal duties he had been previously performing. Dr. Butts, the neurosurgeon who did the surgery at Bayside Hospital, said the patient was in good condition when transferred to the Public Health Service Hospital, free from infection and his prognosis was good; that since there was only partial injury to the spinal cord, he looked at the prognosis favorably. He pointed out that while at Bayside Hospital, X-rays were taken daily. Yet, none were taken at the Public Health Service Hospital.

Dr. Butts said that before and at the time of the transfer there were no symptoms of pneumonia, and that there was improvement in his chest and lungs. He said that at Bayside X-rays were taken daily because of the potential of complications; and that his condition was closely followed. He was corroborated by his associate, Dr. Reina. Dr. Fekete, an internist, was of the same opinion, asserting that his potential for recovery was good; that at time of transfer the patient's condition was stable, he was improving and the potential was good; that the treatment which the patient received at the Public Health Service Hospital was a departure from the normal procedures; that while he was treated with appropriate medication, there was too much medication; that X-rays should have been taken; that on admission he was treated for inhalation, but this was stopped three days before he

expired. He too agreed that with the cast on they could not take X-rays or properly assess the condition and that it required an opening of the cast, or its removal and reinstallation. He said the patient died from acute gastric dilatation.

There was credible testimony accepted by the court that the prescribing of drugs by telephone for such a patient was not proper and in accord with the standard of care employed by the ordinary and prudent practitioner in his field in the community.

### D.

The physician who had the responsibility for the care and attention of the decedent had not seen the patient for considerably more than 48 hours. Nor had he arranged for any other physician to see the patient. Even the Chief of Professional Services at the Public Health Service Hospital said that it was not the practice for patients to go for 24 hours without being seen by a physician. It is true that Dr. Vanderdecker saw the patient about 10:30 or 11:00 o'clock in the morning of November 27, and had seen him the day before, but it is equally clear he made no physical examination of the patient, and his visit was solely to observe his mental condition.

On November 26, the nurse advised Dr. Dannis that the patient had one complaint after another, including super anxiety, stomach cramps, stomach pains, and that his stomach was distended. The nurse feared a drug buildup and intoxication all at once and advised Dr. Dannis of this. Dr. Dannis merely prescribed some medication by telephone. The patient at that time had an impaction of the bowel. The condition was such that the nurse manually removed the impaction. Dr. Dannis prescribed a laxative combination of milk of magnesia and cascara, but still no examination of the stomach was made.

The evidence establishes that with such lack of care, the dangers were foreseeable and the cause of the patient's death was predictable by one exercising proper care. The patient had vomited previously. Dr.

Hyatt, the Chief of Professional Services at the Public Health Service Hospital, said he vomited because he was ill; that he was getting medications which were capable of making him vomit; he had problems with a fecal impaction and patients whose colons are disturbed, do secondarily vomit; that he was on a lot of other medications, all of which could make him vomit; and that he was an agitated patient and that could make him vomit. Dr. Dannis said that one thing that could have caused the patient to vomit was screaming. Although fully alerted that the patient had been vomiting and that he might again vomit, they should have anticipated that one in such condition, confined as he was, could and probably would aspirate. Surely, they knew what would likely result from aspiration of the vomit, which should have alerted him to an existing danger.

The patient's mother visited him on November 26th, the day before he died. She was much disturbed about his condition and made numerous efforts that day and into the night to contact the attending doctor. On that day the patient complained his stomach felt like it was swelling. She noticed his arms were cold and clammy and his face was wet. When she was unable to contact the doctor, she insisted the nurse do so. The nurse reported to her that he could not reach Dr. Dannis. She wanted to remain with him, but was compelled by the security guard to leave. She then insisted that they get some doctor. When she returned to her home she called back to the nurses station to again try to locate the doctor or to have the nurse do so, but was advised the doctor was out of town.

### E.

Dr. Dannis complained that the patient was not able to carry on a normal conversation after the first day. Yet, the nurses seemed to have carried on normal conversations and recorded the events throughout the patient's stay at the Public Health Service Hospital. The mother, who visited him numerous times, testified that she saw no evidence of any mental condition and that her son carried on a normal conversation with her.

There is evidence that the plaintiff's decedent had made some previous use of drugs and that on an occasion some short while before the accident, he exhibited unusual behavior. There is also evidence that his conduct while at the Public Health Service Hospital was disruptive of other patients and that he was difficult to treat, and at times he may have been difficult to manage. Nurse Stainback described him as difficult to take care of, but not to control. Whether this situation was the result of a mental condition or from his lack of ability to tolerate the cast, his discomfort, or lack of attention is not clear, but this is of no real consequence on the issue of liability in this case.

### F.

Plaintiff says that the defendant failed to meet the standard of care in the community for similar patients; that no physical examinations were made of the patient by a physician after the first day of his admission; that no laboratory tests were run or other tests performed; that no proper review was made of the hospital chart; that no examination of any kind was made of the patient within 24 hours of his death and little or no examination for the last several days prior to his death; and that medication was prescribed without the making of examinations or even viewing the patient.

The record shows that Dr. Dannis prescribed medication to continue for a period of three months, six months or a year, all of which was contrary to the standard procedures of the Public Health Service Hospital. Dr. Hyatt said such prescriptions were contrary to their procedures and the only reason he could give for Dr. Dannis doing this way, was the doctor's wish to avoid having to write a prescription again at the end of each week. He said Dr. Dannis objected to the standard procedures of the hospital and this was one of his personal traits of voicing his objection to the standing policies by writing such prescriptions; and that he had

previously discussed the matter with Dr. Dannis. Dr. Hyatt said that their orders require that certain medicines would continue for only some few days and that when that time expired the nurses would not administer the medicine without a new prescription or new order. Where medication required the order of a doctor was to be given for a period longer than seven days, it would clearly appear writing a prescription for three months or more would be negligence, for he knew the nurse would cease giving the medicine at the end of the seven day period, and unless he issued a new order, the medication would not be administered.

### G.

From the moment plaintiff's decedent was admitted to the Public Health Service Hospital, Dr. Dannis sought to have him removed to some other facility, first Staten Island and then Kecoughtan. He explained the delay in the transfer to Kecoughtan by saying someone was making an investigation to determine the patient's eligibility for that facility. There would seem to be two answers to this question. First, if he was not eligible for Kecoughtan, how could he have been eligible for Staten Island? Secondly, and more important, delay in determining eligibility was pure negligence. All that was necessary to be done was to call the patient's mother, who had his certificate of eligibility and would have made it available. It appears Dr. Dannis' only concern was to transfer the patient to another facility, and thereby be relieved of the necessity of treating or caring for him.

### H.

Defendant seeks to excuse its failure to cut holes in the cast so as to be able to examine the heart, lungs and portions of the stomach by suggesting that with the agitated condition of the patient, he might insert his hands in the holes and tear the cast off. The fallacy of such suggestion lies in the fact that a chest tube was in the patient's chest to permit drainage and a catheter was inserted in the patient to relieve his bladder. Surely, if cutting a hole in the cast posed a danger of his tearing the cast off, what prevented him from pulling out the drainage tube and the catheter? But even if this danger existed, there were ways to deal with it. The holes could have been closed after examination. It was much more important to keep the patient alive than to maintain the cast.

While defendant asserts much time was required in treatment to keep the patient's bowels functioning, Dr. Loxley explained that it was much more important to devote time to the care of stomach; that keeping the bowels functioning was a matter of comfort, while care of the stomach was a matter of life or death.

The court finds there was negligence on the part of the defendant in the care and treatment, or rather there was gross lack of treatment and care of the patient, and that the degree of care, skill and diligence employed by defendant did not meet the standard required and that it was not the degree of care, skill and treatment employed by the ordinary and prudent practitioner in his field and community or in similar communities at the time, nor did it meet the standard of care required of specialists, here, orthopedic surgeons, in Virginia and the community or similar communities or of like specialists, orthopedic surgeons in the community or in similar communities. Liability is established against the defendant.

### IV.

In fixing damages in a death action under the Act in Virginia, the trier of the facts is to fix such an award as "may seem fair and just," Virginia Code 8.01–52, taking into consideration (a) sorrow, mental anguish and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent, (b) compensation for reasonably expected loss of income of the decedent, and services, protection, care and assistance provided by the decedent, (c) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death, and (d) reasonable funeral expenses.

As used in the statute, the terms "fair" and "just" are to be given broad and liberal construction. *Pugh v. Yearout,* 212 Va. 591, 186 S.E.2d 58, 61 (1972); *Eisenhower v. Jeter,* 205 Va. 159, 164, 135 S.E.2d 786, 789 (1964).

The monetary damages incurred in the hospitalization of Sawyer between the period of the accident and the time of his transfer to the Public Service Hospital are not shown. The funeral expenses amounted to $2,044.96. The determination of the other items and elements of damages are more difficult.

Sawyer was 34 years old at the time of his death. He had an average life expectancy of 37.2 years. He had for some number of years been in the Merchant Marine. While his earnings were not shown by the evidence, the evidence does show that from his earnings he made a monthly allotment to his mother for $500.00 for her support. Shortly before his death, he became employed by Norfolk Shipbuilding, from which employment he was earning a basic rate of some $4.73 per hour. For a 40 hour week he would earn $189.20, or $9,838.40 per annum. He was survived by his father, mother, two brothers and two sisters. The family ties were described as close.

Under the broad language of the statute, "any 'pecuniary loss' suffered by the statutory beneficiaries is clearly a proper element of damage," *Gough v. Shaner, Admr.,* 197 Va. 572, 90 S.E.2d 171, 176, but in the later cases of *Pugh v. Yearout, supra; Denby v. Davis,* 212 Va. 836, 188 S.E.2d 227; and *Claar v. Culpepper,* 212 Va. 771, 188 S.E.2d 86, in dealing with the question of financial or pecuniary loss sustained by the defendants under the former statute, Virginia Code 8–636, the Court held that absent evidence of contribution or the monetary value of services rendered a dependent, there could be no award for loss of services.

Sawyer had been in his new employment for only a short period. Shortly before his accident, he moved from the home of his parents to an apartment. There was some evidence he contemplated marriage. It would hardly be expected that he would have continued to contribute any substantial sum for the support of his father and mother. Actually, his earnings were not great, and after paying his living expenses, he would not have been able to give them much assistance. However, among other things to be considered are the loss of services, nuture and care, and other advantages and benefits of a pecuniary nature which will be lost in the future. *Gough, supra; Wilson v. Whittaker,* 207 Va. 1032, 154 S.E.2d 124; *Matthews v. Hicks,* 197 Va. 112, 87 S.E.2d 629; *Pugh v. Yearout, supra.*

Needless to say, loss of comfort, guidance and society, like sorrow, mental anguish and solace, are virtually incalculable except in a rough and gross manner. There is no measure of the love of or for a dear one. The only real comfort from sorrow and mental anguish is faith in God. Money is no substitute, and under our statute the amount which may be awarded is what "may seem fair and just." Such an award is not suggested or intended to be replacement of the loss sustained. It is the means provided by which the damaging party may make some amends for the wrong done.

Damages in a death case where the measure is what is fair and just, like in personal injury actions, is to be determined from all of the facts and circumstances. As pointed out in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 590, 94 S.Ct. 806, 817, 39 L.Ed.2d 9 (1974), damages for loss of society can be left to turn mainly upon the good sense and deliberate judgment of the trier, as "insistence on mathematical precision would be illusory," and the judge or jury must be allowed to make a reasonable approximation, guided by judgment and practical experience. It is enough if the evidence shows the extent of damages as a matter of a just and reasonable inference, although the result be only an approximation. *Story Parchment Co. v. Patterson,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Great Coastal Express v. Int. Brotherhood of Teamsters, etc.,* 511 F.2d 839, 845 (4 Cir. 1975). The language in *Story, supra,* has been cited and adopted by the Fourth Circuit in *Kinty v. United Mine Workers of*

*America,* 544 F.2d 706, 725 (4 Cir. 1976), *Great Coastal Express, Inc. v. International Brotherhood of Teamsters, etc., supra,* and earlier in *United Mine Workers v. Patton,* 211 F.2d 742 (4 Cir. 1954). In *Kinty, supra,* the court said, "The Court . . . must do the best it can in fixing fairly the damages due [the] plaintiff[s]." 544 F.2d 725. Likewise, the Supreme Court of Virginia in *United Bank of Fairfax v. Dick Herrimon Ford, Inc.,* 215 Va. 373, 210 S.E.2d 158, 161 (1974), pointed out that a litigant is not required to prove his damages with precision.

█ Guided by the facts and circumstances of the case and the evidence presented, damages are awarded as follows:

(a) To the father and mother the sum of $2,044.96 to cover the funeral expenses

(b) To David W. Sawyer and Lucy E. Sawyer, father and mother, jointly $100,-000.00.

Under the provisions of the Federal Tort Claims Act, the court must fix the fee to be allowed counsel out of said recovery. The court will reserve this issue until counsel and the court can confer. Counsel are requested to contact the court within ten days so that a proper judgment may be entered in this case.